# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE LUIS ROMERO; SALVADOR PADILLA, III, aka SALVADOR PEREZ PADILLA; and EBERARDO MENDEZ,<br><br>Defendants. | No. 2:18-cr-00081-TLN<br><br>**ORDER CLARIFYING RULINGS ON DEFENDANTS' MOTIONS TO DISCLOSE CONFIDENTIAL SOURCE** |

This matter is before the Court on the requests filed by Defendant Salvador Padilla, III (ECF No. 48) and by Defendant Jose Luis Romero (ECF No. 51) to join Defendant Eberardo Mendez's Motion to Disclose Confidential Source's Identity and Other Relevant Source Information (ECF No. 54). The Court held a hearing on February 14, 2019, during which the Court ruled from the bench on the merits of Mendez's motion (ECF No. 54). During this hearing, it became apparent that the parties and the Court would benefit from further clarification of the Court's rulings as they pertain to Defendants Padilla and Romero. That clarification follows.

///
///
///
///

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Factual Background

The first criminal complaint filed in this case sets forth the facts relevant to the instant motions, which are briefly summarized below. (ECF No. 1, Apr. 9, 2018.)[1] The U.S. Drug Enforcement Administration ("DEA") and the Homeland Security Investigations division of the U.S. Department of Homeland Security began investigating Romero in October 2017 based on suspicions that he was a pound-level methamphetamine distributor in the Sacramento area. (ECF No. 1 ¶ 10, Apr. 9, 2018.) That same month, a confidential source cooperating with law enforcement informed agents that Romero's supplier "drove a dark-colored 1996 Chevrolet Impala with shiny silver rims" and lived in the same neighborhood as Romero. (ECF No. 1 ¶ 12, Apr. 9, 2018.)

Law enforcement used this confidential source to initiate a controlled purchase of methamphetamine from Romero in October 2017. (ECF No. 1 ¶ 13, Apr. 9, 2018.) Approximately ten minutes prior to the scheduled time for the controlled purchase, agents observed a man driving a dark-colored Impala arrive at Romero's South Sacramento residence, meet with Romero, and then depart. (ECF No. 1 ¶ 16, Apr. 9, 2018.) Approximately thirty minutes later, the confidential source purchased a pound of methamphetamine from Romero for $3,200. (ECF No. 1 ¶ 19, Apr. 9, 2018.) Agents then observed the Impala and its driver return to Romero's residence following the controlled purchase, at which point Romero got into the Impala. (ECF No. 1 ¶ 21, Apr. 9, 2018.) Agents followed the Impala and, after photographing the driver and Romero while they were inside an O'Reilly Auto Parts Store on Fruitridge Road in Sacramento (ECF No. 43-1 at 58), subsequently misidentified the driver as Anthony Blanks (ECF No. 1 ¶¶ 22–24, Apr. 9, 2018).[2]

In November 2017, the investigating agencies terminated their relationship with their

---

[1] The docket for this case contains two separate entries, both of which are assigned the identifier of ECF No. 1 on this case's docket, for the two separate criminal complaints filed on separate days by the investigating law enforcement agencies. For ease of reference, the two complaints are identified in this Order by the dates of their filing on the docket.

[2] Agents would subsequently learn that the individual they thought to be Blanks was, in fact, Padilla. (ECF No. 1 ¶¶ 93–94, Apr. 10, 2018.) This misidentification of Padilla as Blanks is currently at issue in a pending suppression motion filed separately in this case. (*See* ECF No. 39.)

confidential source after the source was arrested in Shasta County in possession of multiple pounds of drugs and a handgun.  (ECF No. 1 ¶ 11, Apr. 9, 2018.)  Nonetheless, the DEA case agent assigned to the investigation—Amie Anderson—swore that the information the confidential source supplied before the source's termination was reliable and had been corroborated by independent evidence.  (ECF No. 1 ¶ 11, Apr. 9, 2018.)  Prior to officially terminating the confidential source's relationship with law enforcement, Anderson had the confidential source introduce Romero to an undercover agent named Ghazanfari.  (ECF No. 1 ¶ 27, Apr. 9, 2018.)  Ghazanfari assumed the role of instigating and conducting controlled drug purchases.  (ECF No. 1 ¶¶ 27, 32, Apr. 9, 2018.)  Ghazanfari and the investigation team subsequently developed evidence that the individual they would later realize to be Padilla engaged in conduct consistent with illicit drug distribution.  (*See, e.g.*, ECF No. 1 ¶¶ 34–63, 69–73, 81–92, Apr. 10, 2018.)

On February 13, 2018, Ghazanfari initiated two controlled drug purchases from Romero.  (ECF No. 1 ¶ 49, Apr. 9, 2018.)  Prior to the first of these transactions, agents observed a gray Nissan Murano parked at the residence belonging to the man they erroneously believed to be Blanks.  (ECF No. 1 ¶ 50, Apr. 9, 2018.)  The male driver of the gray Nissan left the residence, drove toward a government agent on surveillance, and took photographs of the agent with his phone before driving away.  (ECF No. 1 ¶ 52, Apr. 9, 2018.)  Romero then sold a pound of methamphetamine to Ghazanfari in a controlled purchase.  (ECF No. 1 ¶ 53, Apr. 9, 2018.)  Later that day, agents observed the gray Nissan transporting the person they erroneously believed to be Blanks.  (ECF No. 1 ¶¶ 57–58, Apr. 9, 2018.)  Agents also observed the driver of the gray Nissan meet with Romero both before and after the day's second controlled drug purchase involving Romero and Ghazanfari.  (ECF No. 1 ¶¶ 59–62, Apr. 9, 2018.)  The driver of the gray Nissan also exchanged a package with Romero following the second transaction.  (ECF No. 1 ¶ 62, Apr. 9, 2018.)  California Highway Patrol officers pulled the gray Nissan over later that day and identified the driver as Mendez.  (ECF No. 1 ¶ 63, Apr. 9, 2018.)

Based on probable cause set forth in an affidavit signed by Anderson and attached to the initial criminal complaint (ECF No. 1, Apr. 9, 2018), law enforcement agents executed search and arrest warrants on April 10, 2018 (ECF No. 1 ¶ 93).  It was then that agents realized the driver of

the Chevrolet Impala they had been surveilling for months was named Salvador Padilla, not Anthony Blanks. (ECF No. 1 ¶¶ 93–94, Apr. 10, 2018.) As a result, Anderson swore out a new criminal complaint and affidavit setting forth probable cause that Padilla, not Blanks, engaged in the conspiracy agents had investigated. (ECF No. 1, Apr. 10, 2018.) Defendants Romero, Padilla, and Mendez (collectively, "Defendants") were indicted on April 19, 2018 and charged with distributing and conspiring to distribute methamphetamine. (ECF No. 19-1.) The charges against Defendants cover a period ranging from December 1, 2017—after the investigating agencies terminated the tainted confidential source and replaced the source with Ghazanfari—through March 23, 2018. (ECF No. 19-1 at 1.)

B. Procedural Background

i. *Mendez's Motion to Disclose the Confidential Informant's Identity*

On December 4, 2018, Mendez filed a motion to disclose the identity of, and other relevant information relating to, the now-terminated confidential source who provided law enforcement with information about Romero's supplier. (ECF No. 46.) Mendez's motion was mistakenly noticed for hearing before Magistrate Judge Allison Claire on January 4, 2018 (ECF No. 46 at 1) and was subsequently amended to change the noticed hearing date to January 3, 2019 (ECF No. 49 at 1).

Mendez's motion argued that he was entitled to learn the confidential source's identity because the source might have knowledge pertaining to the *modus operandi* of the drug trafficking organization, specifically that the organization eschews the use of drug couriers like Mendez. (*See* ECF No. 49-1 at 3.) Mendez argued that because the confidential source was correct about the kind of car driven by Romero's supplier and the general location of that supplier's residence, the source would also likely be able to verify that this drug trafficking organization's *modus operandi* is not to use drug runners like Mendez. (ECF No. 49-1 at 7–8.) Mendez's motion also argued that even if the Court were not inclined to order the confidential source's identity disclosed forthwith, the Court should still order an *in camera* hearing to help determine the extent and relevance of the confidential source's knowledge of the drug trafficking organization's practices. (ECF No. 49-1 at 11–12.)

4

### ii. *Padilla's Joinder to Mendez's Disclosure Motion*

The same day Mendez originally moved to disclose the confidential source's identity (ECF No. 46), Padilla filed a two-page document joining Mendez's motion (ECF No. 48).

Padilla's joinder rested on a somewhat different rationale than Mendez's motion, namely that the confidential source should be disclosed because the source was a central participant in a controlled drug transaction that occurred on October 25, 2017. (ECF No. 48 at 1.) According to Padilla, the source's firsthand observation of the October 25, 2017 transaction suggested that the source "likely has relevant, exculpatory information regarding" whether the driver of the Impala that day was Blanks (as government agents originally thought) or Padilla (who was eventually indicted after agents realized that Padilla was, in fact, the Impala driver they had been surveilling). (ECF No. 48 at 2.) Like the caption of Mendez's motion for disclosure (ECF No. 46), the caption of Padilla's joinder noticed a hearing to occur before Magistrate Judge Claire (ECF No. 48 at 1).

### iii. *Romero's Joinder to Mendez's Disclosure Motion*

Two days after Padilla filed his joinder, Romero filed a nearly identical document also joining Mendez's disclosure motion. (ECF No. 51.) Like his co-defendants' motions, the caption of Romero's joinder noticed a hearing before Magistrate Judge Claire. (ECF No. 51 at 1.)

### iv. *Subsequent Motion Practice*

Mendez subsequently filed an amended version of his motion to disclose the confidential source's identity. (ECF No. 54.) This new motion was substantively similar to the motion that had originally been noticed for hearing before Magistrate Judge Claire, except that Mendez's amended motion contained the additional statement that all parties "agree[d] that the original motion [noticed before Magistrate Judge Claire] should be vacated." (ECF No. 54 at 2.) Consistent with this request, the Court vacated Mendez's disclosure motion that had been noticed for hearing before Magistrate Judge Claire. (ECF No. 55.) The Court also calendared Mendez's amended disclosure motion (ECF No. 54) for a hearing on February 14, 2019 before this Court (ECF No. 58).

Neither Padilla nor Romero filed subsequent requests to join Mendez's amended motion

for disclosure of the confidential source's identity (ECF No. 54). The United States filed an opposition to Mendez's amended motion in which it addressed only those arguments raised by, and specific to, Mendez. (ECF No. 59.) Mendez, but neither Padilla nor Romero, filed a reply to the government's opposition. (ECF No. 62.)

*v.     February 14, 2019 Hearing*

The Court held a hearing on Mendez's disclosure motion (ECF No. 54) on February 14, 2019. During the hearing, the Court understood counsel for Padilla and Romero to state that for the reasons set forth in their joinders to Mendez's disclosure motion that was noticed for hearing before Magistrate Judge Claire (ECF No. 46) and thereafter vacated (ECF No. 55), Padilla and Romero also joined in Mendez's amended disclosure motion being heard by this Court that day (ECF No. 54). This was somewhat unexpected, since neither Padilla nor Romero had requested to join Mendez's operative motion (ECF No. 54) following the Court's order vacating Mendez's original motion which Padilla and Romero had affirmatively joined (*see* ECF Nos. 54–62).

After considering the oral arguments made by the parties at the February 14 hearing, the Court denied Mendez's motion in an oral ruling from the bench. The Court further stated that it would reserve ruling on the requests to disclose the confidential source's identity as made at the hearing by Padilla and Romero, because the parties and the Court had expressed some confusion during the hearing about whether Padilla and Romero had intended to join in Mendez's amended motion. Accordingly, the Court now addresses the arguments raised by Padilla (ECF No. 48) and Romero (ECF No. 51) as if they had affirmatively joined Mendez's amended disclosure motion noticed for hearing on February 14 (ECF No. 54).

**II.    STANDARD OF LAW**

The government enjoys a privilege to "withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Roviaro v. United States*, 353 U.S. 53, 59 (1957). That privilege is not absolute, for "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60–61.

In deciding whether to order disclosure of the identity of a confidential source or informant, a district court must weigh three factors, specifically, "(1) the degree of the informant's involvement in the criminal activity; (2) the relationship between the defendant's asserted defense and the likely testimony of the informant; and (3) the government's interest in nondisclosure." *United States v. Gonzalo Beltran*, 915 F.2d 487, 489 (9th Cir. 1990) (per curiam) (citing *United States v. Tenorio-Angel*, 756 F.2d 1505, 1509 (11th Cir. 1985)). With respect to the third of these factors, the government's interest in preserving its privilege to withhold the identity of confidential informants so as to maintain its credibility with other potential informants is significant, because "[t]he purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement." *Roviaro*, 353 U.S. at 59. Indeed, the government's privilege to maintain informants' confidentiality "recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id.*

Generally, an *in camera* hearing to learn the extent and relevance of a confidential source's information is required "where the defendant makes a 'minimal threshold showing' that disclosure would be relevant to at least one defense." *United States v. Spires*, 3 F.3d 1234, 1238 (9th Cir. 1993) (quoting *United States v. Sai Keung Wong*, 886 F.2d 252, 256 (9th Cir. 1989)). This minimal showing, however, must amount to "more than a 'mere suspicion' that the informant has information which will prove 'relevant and helpful' to [a defendant's] defense." *United States v. Henderson*, 241 F.3d 638, 645 (9th Cir. 2000) (quoting *United States v. Amador-Galvan*, 9 F.3d 1414, 1417 (9th Cir. 1993); *United States v. Williams*, 898 F.2d 1400, 1402 (9th Cir. 1990)). Indeed, where a defendant presents evidence that a confidential source might have information that could assist in fashioning a defense, this alone does not mandate a court to hold an *in camera* hearing so long as there is substantial other evidence contradicting the information the confidential source could potentially provide. *See id.* at 646 (upholding denial of request for *in camera* hearing where "disclosure of [the confidential informant's] identity would not have explained away the most convincing evidence of [the defendant's] guilt").

///

### III. ANALYSIS

#### A. Mendez's Motion

The Court stated in detail on the record at the February 14, 2019 hearing its reasons for denying Mendez's disclosure motion (ECF No. 54) and so will not repeat those with any specificity here.

In brief summary, the Court found that Mendez failed to make the required showing that he is entitled to an *in camera* hearing to probe whether the confidential source's knowledge would be relevant to Mendez's defense that his alleged role as a drug courier was inconsistent with this drug trafficking organization's *modus operandi*. *See Spires*, 3 F.3d at 1238 (holding that an *in camera* hearing is required "where the defendant makes a 'minimal threshold showing' that disclosure would be relevant to at least one defense" (quoting *Sai Keung Wong*, 886 F.2d at 256)). The only evidence Mendez presented to meet his initial burden was that the confidential source had the ability to get in touch with Romero and knew two relatively innocuous facts about the targeted organization: (i) that Romero's supplier drove a 1996 Chevrolet Impala and (ii) that Romero's supplier probably lived in South Sacramento. (ECF No. 54 at 4.) The Court found this to be insufficient to meet even the light burden placed on a defendant making a disclosure motion. At best, Mendez's proffered evidence shows that he has a "mere suspicion" that the confidential source could have further information about this drug trafficking organization's habits. *Henderson*, 241 F.3d at 645.

Absent some indication that the confidential source was more than tangentially acquainted with this drug trafficking organization, the Court refused to sanction a fishing expedition based on a "mere suspicion" alone. *Id.*

#### B. Padilla's Joinder

One of Padilla's likely defenses at trial will be that the prosecution cannot prove that he committed any of the crimes for which he is charged because law enforcement agents initially identified a different person—Blanks—as the driver of the Impala they repeatedly observed. (*See* ECF No. 36 at 7 (arguing that agents' initial misidentification of Padilla as Blanks vitiates probable cause to arrest Padilla for drug trafficking).) Accordingly, in his joinder to Mendez's

original disclosure motion, Padilla argues that the confidential source should be disclosed because the source was "a direct eye witness to the transaction alleged to have occurred on [October 25, 2017,] and likely has relevant, exculpatory information regarding the owner and driver of a dark, Chevy Impala that the witness claimed was Mr. Romero's source of supply." (ECF No. 48 at 1–2.) This amounts to an argument that "the degree of the informant's involvement in the criminal activity" in which Padilla allegedly engaged on October 25, 2017 is so significant, and "the relationship between [Padilla's] asserted defense and the likely testimony of the informant" is so strong, that together these factors outweigh any countervailing governmental interests in protecting the informant's identity. *Gonzalo Beltran*, 915 F.2d at 489.

        i.  *Degree of Informant's Involvement in Criminal Activity*

  Padilla's argument is unavailing for two reasons, both of which demonstrate the limited degree of the confidential source's involvement in this case's criminal activity. *Id.* First, the evidence does not establish that the confidential source witnessed those portions of the October 25, 2017 drug transaction in which Padilla is alleged to have personally participated. (*See* ECF No. 48 at 1 (asserting that "the informant was a percipient witness to a Drug [sic] transaction on October 25, 2017 involving Jose Romero and an individual positively identified as Anthony Blanks").) The confidential source was scheduled to buy a pound of methamphetamine from Romero at around noon on October 25, 2017. (ECF No. 1 ¶ 13, Apr. 9, 2018.) The Impala in question, however, arrived at and departed from Romero's residence about half an hour before the controlled purchase took place. (ECF No. 1 ¶¶ 16, 19, Apr. 9, 2018.) Furthermore, the Impala driver did not return to Romero's residence on that day until about half an hour after the confidential source had already concluded buying a pound of methamphetamine from Romero for $3,200. (ECF No. 1 ¶¶ 19, 21, Apr. 9, 2018.)

  Based on these facts, there is little evidence from which the Court might conclude that the confidential source saw the driver of the Impala on October 25, 2017, let alone that the source would have "relevant, exculpatory information regarding the owner and driver of a dark, Chevy Impala." (ECF No. 48 at 2.) There is also no indication the confidential source ever described the Impala driver's physical appearance to government agents, even though the source—had he

known what the Impala driver looked like—would have had every incentive to do so based on the terms of his cooperation agreement with federal law enforcement agencies. (*See* ECF No. 1 ¶¶ 11–27, Apr. 9, 2018.)

Second, the government has not actually charged Padilla with any criminal violations based on his conduct on October 25, 2017. (*See* ECF No. 19-1.) Instead, the Indictment's charges against Padilla are based on alleged conduct that began on December 1, 2017 (ECF No. 19-1), conduct which law enforcement agents closely monitored as they developed probable cause to believe Padilla engaged in a conspiracy to distribute methamphetamine (*e.g.*, ECF No. 1 ¶¶ 34–63, 69–73, 81–92, Apr. 10, 2018). The fact that the confidential informant was terminated as a government cooperator prior to the earliest date charged in the Indictment (*see* ECF No. 1 ¶ 13, Apr. 10, 2018) is compelling evidence that "the degree of the informant's involvement in the criminal activity" for which Padilla was indicted is minimal, *Gonzalo Beltran*, 915 F.2d at 489.

Accordingly, the Court finds that Padilla has failed to demonstrate more than a "mere suspicion" that the confidential source has information that would be relevant to Padilla's misidentification defense. *Henderson*, 241 F.3d at 645. An *in camera* hearing is therefore unwarranted because Padilla has not made "a 'minimal threshold showing' that disclosure would be relevant to at least one defense." *Spires*, 3 F.3d at 1238 (quoting *Sai Keung Wong*, 886 F.2d at 256). Stated another way, Padilla has failed to demonstrate that "the degree of the informant's involvement in the criminal activity" charged in this case is significant enough to merit compelled disclosure of the informant's identity. *Gonzalo Beltran*, 915 F.2d at 489.

      *ii.*  *Relationship Between Informant's Testimony and Padilla's Defense*

Even if Padilla's disclosure motion was based on more than a hunch that the confidential source would be able to provide information relevant to Padilla's misidentification defense, his request for an *in camera* hearing would still fail. This is because the confidential source would be unable to provide information that could "explain[] away the most convincing evidence" that Padilla was, in fact, the person who agents observed engaging in activities consistent with drug trafficking in late 2017 and early 2018. *Henderson*, 241 F.3d at 646. In other words, the

exculpatory value of "the relationship between [Padilla's] asserted defense and the likely testimony of the informant" is limited by the extensive evidence that Padilla was, in fact, the person who law enforcement agents observed engaging in the conduct described in the government's charging documents. *Gonzalo Beltran*, 915 F.2d at 489; (*see also* ECF No. 1, Apr. 10, 2018; ECF No. 19-1).

In *Henderson*, 241 F.3d at 642, defendant Darren Eugene Henderson challenged his conviction for multiple bank robberies which came about because of a tip by a confidential informant who told law enforcement that Henderson "was the bank robber depicted on a television episode of 'America's Most Wanted.'" Henderson's defense was that he was framed by some of the numerous enemies he had made through his work as a police informant, and that learning the identity of the confidential informant would have helped Henderson explain the informant's motivation to falsely implicate Henderson in the robberies. *Id.* at 645. The district court declined to disclose the identity of the confidential informant, and also declined to hold an *in camera* hearing on Henderson's disclosure request. *Id.* at 642. Henderson was convicted after (i) eyewitness testimony from employees from two of the victimized banks established that Henderson was, in fact, the robber; and (ii) testimony from a police detective who "knew Henderson and, based on his review of the surveillance photographs from the January 16th bank robbery, . . . testified that Henderson was the man depicted in the photograph robbing that bank." *Id.* at 645. Noting that district courts enjoy broad discretion when deciding either to order disclosure of an informant or to hold an *in camera* hearing on the topic, the Ninth Circuit upheld the district court's decision to deny Henderson's disclosure request because "no matter what evil motives Henderson's informant may have had, disclosure of his identity would not have explained away the most convincing evidence of Henderson's guilt." *Id.* at 646. That evidence of Henderson's guilt included testimony from two eyewitnesses and a law enforcement agent, all of whom positively identified Henderson as the robber of the banks in question. *Id.*

Much the same is true in this case because there is significant evidence that Padilla was the driver of the Chevrolet Impala observed by government agents interacting with individuals suspected of illegally trafficking drugs on October 25, 2017. (ECF No. 1 ¶¶ 15–28, Apr. 10,

2018; ECF No. 43-1 at 58). As in *Henderson*, 241 F.3d at 645–46, this includes evidence from eyewitnesses who can identify Padilla as the driver of the Chevrolet Impala on October 25, 2017, based on their firsthand observations of him on and following that date (*see, e.g.*, ECF No. 1 ¶¶ 25, 37–44, 51–63, 70–73, Apr. 10, 2018). And like the detective's positive identification testimony in *Henderson*, 241 F.3d at 645, government agents can corroborate that Padilla was the Impala's driver by comparing his appearance to the digital photographs of that driver taken in close temporal proximity to the October 25, 2017 controlled drug transaction (ECF No. 1 ¶ 25, Apr. 10, 2018; ECF No. 43-1 at 58).[3]

The identification evidence against Padilla is even more "convincing," *Henderson*, 241 F.3d at 646, for the period following October 25, 2017, which is the period actually encompassed by the Indictment (*see* ECF No. 19-1). This is because government agents can identify Padilla as the individual described in the criminal complaint as playing an integral role in multiple controlled purchases of illegal narcotics that occurred after October 25, 2017. (ECF No. 1 ¶¶ 25, 37–44, 55–63, 70–73, Apr. 10, 2018.) This significant amount of evidence identifying Padilla as the person who agents observed engaging in conduct consistent with illegal narcotics distribution on multiple instances that were actually charged in the Indictment (ECF No. 19-1) compels the conclusion that disclosure of the confidential informant's identity is not warranted because "disclosure of [the informant's] identity would not . . . explain[] away the most convincing evidence of" Padilla's appearance and identification, *Henderson*, 241 F.3d at 646.

Hence, because there is little exculpatory value to "the relationship between [Padilla's] asserted defense and the likely testimony of the informant," this factor weighs against Padilla's argument that he should be told the informant's identity. *Gonzalo Beltran*, 915 F.2d at 489.

        *iii.*      *Disposition*

Based on the foregoing, the Court finds that Padilla's interest in obtaining the identity of the confidential informant is outweighed by the government's countervailing interest in

---

[3] It is also worth noting that the Court itself has had the benefit of observing Padilla firsthand during Padilla's in-court appearances. The Court has compared Padilla's in-person appearance to the digital photograph taken by law enforcement agents of the Chevrolet Impala's driver inside the O'Reilly Auto Parts Store on October 25, 2017, and finds it beyond dispute that Padilla is the person depicted in that photograph. (*See* ECF No. 43-1 at 58.)

maintaining the secrecy of the informant's identity. *See id.* at 488–89 ("In order to balance the interests of the individual and society, we examine three factors: (1) the degree of the informant's involvement in the criminal activity; (2) the relationship between the defendant's asserted defense and the likely testimony of the informant; and (3) the government's interest in nondisclosure."); *Roviaro*, 353 U.S. at 59 (noting that the government's privilege to maintain informants' confidentiality "recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation").

For the foregoing reasons, Padilla's request for disclosure of the confidential informant's identity (ECF No. 48) is DENIED.

### C. Romero's Joinder

Romero's cursory argument in favor of disclosing the confidential source's identity substantially mirrors Padilla's, in that Romero also asserts that the confidential informant "likely has relevant, exculpatory information regarding the owner and driver of a dark, Chevy Impala that the witness claimed was Mr. Romero's source of supply." (ECF No. 51 at 1.) Romero also endorses and incorporates by reference the arguments made in Mendez's disclosure motion. (ECF No. 51 at 1–2.) To succeed, Romero's joinder request must demonstrate that there is a "relationship between [his] asserted defense and the likely testimony of the informant" that outweighs the government's interest in nondisclosure. *Gonzalo Beltran*, 915 F.2d at 489; *see also Spires*, 3 F.3d at 1238 (holding that an *in camera* hearing is required "where the defendant makes a 'minimal threshold showing' that disclosure would be relevant to at least one defense" (quoting *Sai Keung Wong*, 886 F.2d at 256)).

Romero fails to meet this burden because his joinder request relies almost entirely on points raised by his co-defendants that are inapplicable to his situation. Unlike Padilla, Romero does not appear to be planning to present a mistaken identity defense, nor is there evidence that government agents were ever mistaken or confused as to Romero's identity during their investigation. (*See* ECF No. 1 ¶¶ 10, 28–29, Apr. 9, 2018 (identifying Romero and naming him as a target of the investigation); ECF No. 1 ¶¶ 11–12, Apr. 10, 2018 (explaining that investigators

originally misidentified Padilla as Blanks until their mistake was uncovered upon execution of search and arrest warrants).) That Romero is not arguing mistaken identity makes sense given that government agents interacted with him personally on numerous occasions during their investigation, which again is different from the agents' more limited encounters with Padilla. (*See, e.g.*, ECF No. 1 ¶¶ 41, 53, 56, 61, Apr. 9, 2018.) Because Romero's identity is not at issue, it would be neither "relevant, [nor] exculpatory" vis-à-vis Romero for the confidential witness to provide evidence "regarding the owner and driver of a dark, Chevy Impala that the witness claimed was Mr. Romero's source of supply." (ECF No. 51 at 1.) The identity of his supplier is irrelevant to whether the government can prove beyond a reasonable doubt that Romero sold illicit narcotics directly to an undercover government agent on more than one occasion. (*See, e.g.*, ECF No. 1 ¶¶ 41, 53, 61, Apr. 9, 2018.)

The same is true of Mendez's arguments that Romero also incorporates into his joinder request. (ECF No. 51 at 2 ("Mr. Romero incorporates that legal argument [from Mendez's disclosure motion] and joins in the request for disclosure of the confidential source.").) Mendez's unsuccessful disclosure motion argued that the confidential source's identity should be disclosed because the informant would be able to confirm that this drug trafficking organization's *modus operandi* "was to conduct business without the use of a courier or a middleman," exonerating Mendez because "Mendez is accused of being a drug courier . . . in a conspiracy to distribute methamphetamines." (ECF No. 54 at 7.) Mendez's argument has little to no relevance to Romero's situation because Romero stands accused of playing a central role in the charged drug distribution conspiracy (ECF No. 1 ¶ 10, Apr. 9, 2018), a fact which Mendez's motion explicitly references (*see* ECF No. 54 at 9 (describing the numerous instances in which Romero allegedly participated directly in illicit drug transactions)). Indeed, even if the confidential source could exonerate Mendez by providing evidence that this case's drug trafficking organization eschews couriers, that is irrelevant to whether the government can prove beyond a reasonable doubt that Romero himself sold illicit narcotics directly to an undercover government agent on more than one occasion. (*See, e.g.*, ECF No. 1 ¶¶ 41, 53, 61, Apr. 9, 2018.)

Accordingly, Romero has not shown that disclosing the confidential informant's identity

would be relevant to any of his anticipated defenses, *see Spires*, 3 F.3d at 1238, and has therefore failed to demonstrate the existence of a "relationship between the defendant's asserted defense and the likely testimony of the informant," *Gonzalo Beltran*, 915 F.2d 489. The Court thus finds that Romero's interest in obtaining the identity of the confidential informant is outweighed by the government's countervailing interest in maintaining the secrecy of the confidential informant's identity. *See id.* at 488–89 ("In order to balance the interests of the individual and society, we examine three factors: (1) the degree of the informant's involvement in the criminal activity; (2) the relationship between the defendant's asserted defense and the likely testimony of the informant; and (3) the government's interest in nondisclosure."); *Roviaro*, 353 U.S. at 59 (noting that the government's privilege to maintain informants' confidentiality "recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation").

For the foregoing reasons, Romero's request for disclosure of the confidential informant's identity (ECF No. 51) is DENIED.

### IV. CONCLUSION

For the reasons set forth above, the requests for disclosure of the identity of the confidential informant filed by Padilla (ECF No. 48) and Romero (ECF No. 51) are DENIED.

IT IS SO ORDERED.

Dated: March 20, 2019

_____
Troy L. Nunley
United States District Judge