UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE LUIS ROMERO; SALVADOR PADILLA, III, aka SALVADOR PEREZ PADILLA; and EBERARDO MENDEZ;<br><br>Defendants. | No. 2:18-cr-00081-TLN<br><br>**ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS** |

This matter is before the Court on Defendant Salvador Perez Padilla's Motion to Suppress Evidence Obtained From Tainted Warrant (ECF No. 36), as well as Defendant Eberardo Mendez's Joinder in Co-Defendant Salvador Padilla's Motion to Suppress (ECF No. 39). The United States opposes the motions filed by Padilla and Mendez (hereafter, "Defendants"). (ECF No. 43.) The Court held a hearing on the motions on December 6, 2018. (*See* ECF No. 50.) For the reasons articulated on the record during that hearing, and for the reasons set forth in this Order, the Court DENIES the motions.

///

///

///

///

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

Along with Defendant Jose Luis Romero, Padilla was charged in Count One of an Indictment, issued on April 19, 2018, with conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and was charged in Counts Two, Three, and Four of the Indictment with distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). (ECF No. 19 at 1–3.) Mendez was charged in Counts One, Three, and Four of the Indictment. (ECF No. 19 at 1–3.) The government, on November 1, 2018, dismissed Count Three of the Indictment as to Padilla and Mendez only. (*See* ECF No. 38.) Padilla filed the instant motion to suppress on October 9, 2018. (ECF No. 36.) Mendez filed a joinder to Padilla's motion that set forth additional arguments applicable to Mendez only. (ECF No. 39.) Mendez subsequently pleaded guilty to Count One of the Indictment, and his sentencing hearing is currently pending. (*See* ECF No. 81; ECF No. 76.)

## A. Factual Background

### i. *November 27, 2017 Application for Tracking Warrant*

During an investigation into methamphetamine distribution in the Sacramento area, a special agent for the U.S. Drug Enforcement Administration ("DEA") named Amie Anderson applied to a magistrate judge on November 27, 2017, for a warrant to install a global positioning system ("GPS") tracking device on a 1996 Chevrolet Impala with California license plate 6FZU625. (ECF No. 36 at 7; ECF No. 39-1 at 2–10.)[1] Agent Anderson's application identified the driver of the Impala as an individual named Anthony Blanks, who was present during an alleged narcotics transaction involving Romero. (ECF No. 36 at 7; ECF No. 39-1 at 6–8.)

### ii. *April 9, 2018 Probable Cause Affidavit*

Following months of subsequent investigation of the suspected drug trafficking organization, including law enforcement observations generated from the tracking device installed on the Impala (*see* ECF No. 36 at 9), Agent Anderson swore out a probable cause affidavit on April 6, 2018, which was filed with the Court on April 9, 2018 (ECF No. 1, Apr. 9,

---

[1] The document at docket entry 39-1 remains sealed. (ECF No. 39-1.) Accordingly, any discussion of the contents of this document contains only those facts which have previously been made publicly available on the docket. (*See, e.g.*, ECF No. 36 at 7–8.)

2018).[2] This affidavit was made in support of search warrants for three residential properties in Sacramento, California; a gray Nissan Murano with California license plate 7WGS486; and the Impala. (ECF No. 1 ¶ 1, Apr. 9, 2018.) Agent Anderson's affidavit was also made in support of a criminal complaint as well as arrest warrants for Romero, Mendez, and Blanks. (ECF No. 1 ¶ 2, Apr. 9, 2018.) The affidavit identified Romero as "a pound-level methamphetamine distributor in the Sacramento area" (ECF No. 1 ¶ 10, Apr. 9, 2018), named Mendez as one of Romero's suppliers and the owner of the Murano (ECF No. 1 ¶¶ 10, 72, Apr. 9, 2018), and named Blanks as another of Romero's suppliers and the registered owner of the Impala (ECF No. 1 ¶¶ 10, 18, Apr. 9, 2018).

Agent Anderson's April 9 affidavit included the following information. On October 24, 2017, a confidential source working for federal law enforcement agencies initiated a request for a controlled purchase of methamphetamine from Romero, with the transaction scheduled to occur the following day around noon. (ECF No. 1 ¶ 13, Apr. 9, 2018.) Ten minutes before the controlled drug purchase was set to occur on October 25, federal agents observed the Impala arrive at Romero's home, where its driver met with Romero. (ECF No. 1 ¶ 16, Apr. 9, 2018.) The Impala and its driver departed from Romero's residence prior to the controlled purchase, which took place at around 12:25 p.m., and appeared to conduct counter-surveillance maneuvers before parking at 5120 25th Street in Sacramento. (ECF No. 1 ¶¶ 17, 19–20, Apr. 9, 2018.) At the time of the affidavit, the Impala was registered to Anthony Blanks at 7390 Cranston Way in Sacramento. (ECF No. 1 ¶ 18, Apr. 9, 2018.) About half an hour following the confidential informant's controlled purchase of methamphetamine from Romero, the Impala and its driver returned to Romero's residence and picked up Romero. (ECF No. 1 ¶¶ 20–21, Apr. 9, 2018.) Three minutes later, law enforcement agents observed the Impala parked at an O'Reilly Auto Parts store a short distance away on Fruitridge Road. (ECF No. 1 ¶ 22, Apr. 9, 2018.) Romero went inside the store while the Impala's driver initially stayed inside the vehicle. (ECF No. 1 ¶

---

[2]        The docket for this case contains two separate entries, both of which are assigned the identifier of ECF No. 1, for the two separate criminal complaints filed on April 9 and 10, 2018 by the investigating law enforcement agencies. For ease of reference, the two complaints are identified in this Order by the dates of their filing on the docket.

22, Apr. 9, 2018.)  While the driver remained inside the Impala, a Sacramento Police Department patrol officer contacted the driver.  (ECF No. 1 ¶ 22, Apr. 9, 2018.)

Following this apparently uncoordinated and unexpected local law enforcement contact (*see* ECF No. 1 ¶ 24, Apr. 9, 2018), the Impala's driver joined Romero inside the auto parts store (ECF No. 1 ¶ 22, Apr. 9, 2018).  A federal law enforcement agent then took "several digital photos of both subjects" while they were inside the store.  (ECF No. 1 ¶ 23, Apr. 9, 2018.)  After this surveillance concluded, "BLANKS was identified as the driver of the Impala based on an agent's observations and comparison with a DMV photo of BLANKS."  (ECF No. 1 ¶ 23, Apr. 9, 2018.)  Federal agents then corroborated their identification of Blanks as the person driving the Impala that day by speaking with the Sacramento Police Department dispatcher who recorded the patrol officer's contact with the Impala's driver while it was parked outside the O'Reilly Auto Parts store.  (ECF No. 1 ¶ 24, Apr. 9, 2018.)  The Sacramento Police Department not only confirmed that Blanks was the Impala's driver at the time of the contact, but also informed federal agents that Blanks was a member of Sacramento's Norteño street gang.  (ECF No. 1 ¶ 24, Apr. 9, 2018.)

Federal agents continued to monitor the man they had identified as Blanks and observed him, along with Romero and Mendez, engage in numerous subsequent activities suggestive of an active conspiracy to distribute methamphetamine.  Specifically, agents observed this individual drive the Impala to and from Romero's residence just prior to controlled methamphetamine purchases from Romero on December 4, 2017.  (ECF No. 1 ¶¶ 32–42, Apr. 9, 2018.)  The individual identified as Blanks drove the Impala at times of day consistent with his having received telephonic contact from Romero "several times near the time of the controlled purchase."  (ECF No. 1 ¶ 45, Apr. 9, 2018.)  The same is largely true of law enforcement observation of the individual identified as Blanks on February 13, 2018, with the addition on this date of Mendez appearing to act as a courier between the individual identified as Blanks and Romero.  (ECF No. 1 ¶ 49–56, Apr. 9, 2018.)  Federal agents also concluded that the individual they identified as Blanks tried to hide his Impala from law enforcement detection by covering it with a tarp at an address other than his primary residence.  (ECF No. 1 ¶ 69, Apr. 9, 2018.)  And

on March 6, 2018, as Agent Anderson was surveilling the man she believed to be Blanks, that individual approached her and took a photograph or video of her with his phone.  (ECF No. 1 ¶ 70, Apr. 9, 2018.)  The individual thought to be Blanks then followed Agent Anderson's vehicle for about half a mile after she terminated surveillance.  (ECF No. 1 ¶ 71, Apr. 9, 2018.)

The DEA subpoenaed records of various cellular phone numbers that communicated with Romero at times which suggested that the owner of the numbers was coordinating methamphetamine distribution with Romero.  (ECF No. 1 ¶¶ 81–85, Apr. 9, 2018.)  The subscriber account for each of these numbers contained some variation of the name "Nick Cole" along with a mailing address that contained some variation of the number thirty-eight.  (ECF No. 1 ¶¶ 81–85, Apr. 9, 2018.)  Agent Anderson averred that based on her training and experience, she believed that these cellular phone numbers were used by the person who agents had identified as Blanks.  (ECF No. 1 ¶ 86, Apr. 9, 2018.)

The magistrate judge who reviewed Agent Anderson's affidavit found that it established probable cause, *inter alia*, to search the residence of the individual identified as Blanks (5120 25th Street in Sacramento) and to arrest the individual thought to be Blanks.  (ECF No. 1 at 24, Apr. 9, 2018.)

### iii.    Warrant Execution

Federal law enforcement agents executed the warrant to search 5120 25th Street on April 10, 2018; however, when they encountered the individual they believed to be Blanks inside the residence, they discovered that his name was not actually Anthony Blanks.  (ECF No. 1 ¶ 11, Apr. 10, 2018; ECF No. 43 at 2.)  Instead, following some initial confusion, the individual inside the residence at 5120 25th Street identified himself as Salvador Padilla.  (ECF No. 43 at 2.)  "[O]nly then did the agents realize that the man they had been following on surveillance for six months and believed was Anthony Blanks was actually Salvador Padilla."  (ECF No. 43 at 2.)  The federal agents executing the warrants nonetheless arrested Padilla, "based on probable cause that he had committed various offenses of the federal criminal code."  (ECF No. 1 ¶¶ 11, 93, Apr. 10, 2018.)

///

That same day, following execution of the warrants for which she had previously applied, Agent Anderson swore out a new probable cause affidavit in support of a criminal complaint and arrest warrant issued for Padilla.  (ECF No. 1 at 21, Apr. 10, 2018.)  The April 10 affidavit attributed substantially the same conduct to Padilla as the affidavit filed the day before had attributed to Blanks.  Specifically, the April 10 affidavit set forth law enforcement's observation of multiple contacts Padilla had with Romero both before and after Romero sold a pound of methamphetamine to an undercover agent on October 25, 2017, including almost the same sequence of subsequent events involving Padilla, Romero, the Sacramento Police Department patrol officer, and the O'Reilly Auto Parts store on Fruitridge Road with the exception of any reference to the Norteño gang.  (ECF No. 1 ¶¶ 15–28, Apr. 10, 2018.)  The April 10 affidavit also described: (i) multiple contacts Padilla had with Romero both before and after Romero sold a pound of methamphetamine to an undercover agent on December 4, 2017 (ECF No. 1 ¶¶ 36–50, Apr. 10, 2018); (ii) multiple contacts Padilla had with Romero and Mendez prior to another controlled methamphetamine purchase from Romero on February 13, 2018 (ECF No. 1 ¶¶ 51–63, Apr. 10, 2018); (iii) Padilla's attempts to evade law enforcement surveillance and detection by moving the Impala to a location other than his residence and by covering it with a tarp (ECF No. 1 ¶ 71, Apr. 10, 2018); (iv) Padilla's efforts to record and follow Agent Anderson as she surveilled him on March 6, 2018 (ECF No. 1 ¶¶ 72–73, Apr. 10, 2018); and (v) the strategy of attempting to evade digital detection through the use of multiple cellular phone numbers registered to a variant of the name "Nick Cole" at different Sacramento-area addresses, all of which contained a variant of the number thirty-eight (ECF No. 1 ¶¶ 83–88, Apr. 10, 2018).

However, Agent Anderson did more than simply replace every instance of the name "Blanks" in the April 9 affidavit with the name "Padilla" in the April 10 affidavit.  The April 10 affidavit stated that federal law enforcement agents obtained independent evidence during their execution of the search warrant at 5120 25th Street suggesting that Padilla was, in fact, the person previously believed to be named Blanks.  (ECF No. 1 ¶ 94, Apr. 10, 2018.)  This evidence included: (i) the fact that Padilla was renting a bedroom inside 5120 25th Street for $450 per

month in cash; (ii) the certificate of title for the Impala, issued to Blanks and located inside Padilla's bedroom; (iii) Padilla's driver license, located inside the bedroom; and (iv) one of the cellular phones that agents had been tracking, also located inside the bedroom.  (ECF No. 1 ¶ 94, Apr. 10, 2018.)  The cellular phone in question rang from underneath the sheets of Padilla's bed when Agent Anderson dialed a number that she knew to be registered to an account in the name of Nick Colt in Sacramento, and that had been used to communicate with Romero around the time a government agent asked Romero if he could purchase two pounds of methamphetamine.  (ECF No. 1 ¶¶ 81–82, 94, Apr. 10, 2018.)[3]

Agent Anderson's April 10 affidavit requested the issuance of a criminal complaint and arrest warrant for Padilla, which was granted that same day.  (ECF No. 1 ¶ 95, Apr. 10, 2018.)

### B.  Procedural Background

#### i.  Defendants' Motions

Characterizing it as fruit from a poisonous tree, Padilla filed a motion to suppress all evidence obtained against him that derived from the initial warrant to track the Impala that had been based on the misidentification of Padilla as Blanks.  (ECF No. 36 at 9.)  Padilla argues that either (i) "the identification of Mr. Blanks by his DMV photo was accurate, in which case Mr. Padilla should not have been arrested," or else (ii) "the identification of Mr. Blanks was inaccurate and false (as the subsequent affidavit claims) and cannot form the basis for the warrant – much less probable cause to arrest Mr. Padilla."  (ECF No. 36 at 7.)  According to Padilla, all the evidence obtained from the warrants reliant upon the agents' misidentification of Padilla as Blanks must be suppressed because the original warrant to track the Impala was only issued on the basis of probable cause that depended on this false identification.  (ECF No. 36 at 7–9.)

Padilla also argues that pursuant to legal principles articulated in *Franks v. Delaware*, 438 U.S. 154 (1978), he is entitled to an evidentiary hearing to probe the factual background of agents' misidentification of him as Blanks.  (ECF No. 36 at 3–4 ("A defendant is entitled to an

---

[3]     Additionally, though this information was not included in Agent Anderson's April 10 probable cause affidavit, the government asserts that agents executing the search warrants at 5120 25th Street asked Padilla if his name was Anthony Blanks and he responded with a tentative affirmance.  (ECF No. 43 at 2.)  Agents executing the warrants also "found a notice from the DMV issued to Anthony Blanks elsewhere in Padilla's bedroom."  (ECF No. 43 at 2.)

evidentiary hearing if s/he 'makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause.'" (quoting *United States v. Craigshead*, 539 F.3d 1080–81 [sic] (9th Cir. 2008))).) Padilla argues that the correct identity of the individual driving the Impala throughout the agents' surveillance of this drug trafficking organization was "plainly material" to the magistrate judge's finding of probable cause in the April 9 affidavit. (ECF No. 36 at 4.) Padilla also argues that this misidentification was reckless because law enforcement agents failed to take certain steps to verify that they had correctly identified the Impala's driver as Blanks. (*See* ECF No. 36 at 5 ("There is no evidence that the agents ever attempted to go to 7390 Cranston Way, the known address of Mr. Blanks.").)

Padilla's co-defendant, Mendez, filed a motion a short time later that joined in Padilla's suppression motion. (ECF No. 39 at 1.) Mendez's motion asks the Court to "traverse the [November 2017] mobile tracking warrant and suppress all evidence collected against Mendez as a result of the DEA's use of the mobile tracking device." (ECF No. 39 at 5.) Mendez argues that the Court should suppress "any observation and surveillance intel gathered against Mendez as a result of knowing the Impala's location on relevant dates and times, including any evidence collected on February 13, 2018." (ECF No. 39 at 5–6.)[4]

### ii. Government's Opposition

The government filed a single opposition to both motions in which it disputes Defendants' argument that the misidentification of Padilla as Blanks was an intentional or reckless error. (ECF No. 43.) The government instead characterizes the misidentification as a mere mistake that does not mandate a *Franks* evidentiary hearing. (ECF No. 43 at 5.)

Specifically, the government points out that "any misidentification of the two men was reasonable" because Padilla and Blanks are similar in "height, weight, build, and age." (ECF No. 43 at 6.) In support of that argument, the government points the Court's attention to the following

---

[4] February 13, 2018 is the date when law enforcement observed Mendez meeting with his co-defendants before and after an undercover agent purchased methamphetamine from Romero. (ECF No. 1 ¶¶ 49–63, Apr. 9, 2018.)

8

images: a California Department of Motor Vehicles ("DMV") database image of Blanks (ECF No. 43-1 at 1, 54); an image of Padilla's California driver license (ECF No. 43-1 at 1, 56); and a surveillance image of Padilla and Romero taken by law enforcement agents on October 25, 2017, while the two men were inside the O'Reilly Auto Parts store on Fruitridge Road (ECF No. 43-1 at 1, 58). The government also argues that even if Padilla had been correctly identified in Agent Anderson's original probable cause affidavit, that affidavit would still have supplied probable cause to support the warrants approved by the magistrate judge. (ECF No. 43 at 7.)

### iii.  Hearing

The Court held a hearing on Defendants' suppression motions on December 6, 2018. (*See* ECF No. 50.) The Court heard compelling oral argument from both sides, expressed doubt that the warrants must be suppressed as violative of the Fourth Amendment, and took the matter under submission. (*See* ECF No. 50.)

### iv.  Subsequently Filed Investigator Report

Following the December 6, 2018 hearing, Padilla filed a report from a private investigator named Robert Hessee. (ECF No. 53.) Hessee's report sets forth the content of an interview Hessee conducted with Blanks on September 15, 2018, in which Blanks told Hessee that he has known Padilla for many years, that Blanks owns the Impala at issue in this case, and that Blanks drove it frequently between October 2017 and March 2018. (ECF No. 53-1 at 1.) According to Hessee's report, Blanks does remember driving to the O'Reilly Auto Parts store on Fruitridge Road, but "does not remember the specific date that he drove the car to and from O'Reilly auto parts." (ECF No. 53-1 at 1.) Finally, Blanks's statement to Hessee disclaims any previous gang contact or affiliation as well as any knowledge of the name "Nick Cole" that was used to register the multiple cellular phones that agents tracked over the course of the investigation. (ECF No. 53-1 at 1.) The Hessee report contains information that Padilla stated he would introduce into evidence through live testimony in the event of a *Franks* hearing. (ECF No. 53 at 1.)

## II.  STANDARD OF LAW

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the

persons or things to be seized." U.S. Const. amend. IV.  The Supreme Court has clearly

articulated the procedure to be followed when, as here, a defendant brings a Fourth Amendment

challenge to a law enforcement officer's probable cause affidavit:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.  In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks*, 438 U.S. at 155–56.

"A defendant is entitled to a *Franks* hearing only if he makes a two-fold showing:

intentional or reckless inclusion or omission, and materiality."  *United States v. Bennett*, 219 F.3d

1117, 1124 (9th Cir. 2000).  Hence, a defendant must first "demonstrate some intentional or

reckless falsity, at a minimum, before a further inquiry [in the form of an evidentiary hearing] is

required."  *United States v. Ruddell*, 71 F.3d 331, 334 (9th Cir. 1995) (citing *Franks*, 438 U.S. at

171–72).  While "[c]lear proof is not required" in order to merit a full evidentiary hearing, *United

States v. Chesher*, 678 F.2d 1353, 1362 (9th Cir. 1982), the defendant's preliminary showing of

intentional or reckless falsity must be "accompanied by an offer of proof," *Franks*, 438 U.S. at

171, one that is "substantial," *id.* at 155–56.  Indeed, "[a]llegations of negligence or innocent

mistake are insufficient" to qualify for an evidentiary hearing.  *Id.* at 171; *see also United States

v. Burnes*, 816 F.2d 1354, 1358 (9th Cir. 1987) ("Mere negligence in 'checking or recording the

facts relevant to a probable-cause determination' is not sufficient to warrant a *Franks* hearing."

(quoting *Franks*, 438 U.S. at 170) (citing *United States v. Brooklier*, 685 F.2d 1208, 1221 (9th

Cir. 1982))).  Furthermore, "if, when material that is the subject of the alleged falsity or reckless

disregard is set to one side, there remains sufficient content in the warrant affidavit to support a

finding of probable cause, no hearing is required."  *Franks*, 438 U.S. at 171–72.

However, if the defendant meets his or her initial burden to make a substantial preliminary

showing of intentional or reckless falsity combined with materiality, then a *Franks* hearing is merited "to investigate the veracity of the affiant." *United States v. Dozier*, 844 F.2d 701, 704 (9th Cir. 1988) (citing *United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983)). At this hearing, the defendant must establish — now by meeting the more demanding standard of a preponderance of the evidence — that the warrant affiant's challenged averments were made intentionally or with reckless disregard for the truth. *Franks*, 438 U.S. at 155–56. If the defendant at this hearing proves intentional or reckless falsity by a preponderance of the evidence, and if "the affidavit's remaining content [once stripped of all false material] is insufficient to establish probable cause," the fruits of the warrant will be excluded. *Id.* at 156.

Finally, underlying all the foregoing is the well-settled rule that "[i]n doubtful cases, preference should be given to the validity of the warrant." *Burnes*, 816 F.2d at 1357 (alteration in original) (quoting *United States v. McQuisten*, 795 F.2d 858, 861 (9th Cir. 1986)). This deference extends to the affidavit underlying the warrant, for the "inquiry [of whether a defendant has made a substantial preliminary showing of deliberate or reckless falsity] begins with a presumption that an affidavit in support of a search warrant is valid." *United States v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004) (citing *Franks*, 438 U.S. at 171).

A.     Intentional or Reckless Disregard for the Truth

Generally, a misstatement in a probable cause affidavit is made with reckless disregard for the truth where the affiant displays a "high degree of awareness of probable falsity." *United States v. Senchenko*, 133 F.3d 1153, 1158 (9th Cir. 1998); *see also United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003) ("The defendant [to qualify for a *Franks* hearing] 'must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless disregard.'" (citing *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990))). The line between a substantial preliminary showing of reckless disregard for the truth and a showing of mere negligent mistake can be somewhat amorphous. *See, e.g.*, *United States v. Hamilton*, No. CR11-415-JCC, 2012 WL 5834886, at *6 (W.D. Wash. Nov. 16, 2012) ("There appears to be little case law defining the term 'reckless disregard for the truth' in this context."). As a result, most of the cases delineating

this line in the Ninth Circuit are heavily fact-dependent, and a few of the more relevant cases deciding where to draw that line are briefly described below.

### i. *United States v. Chesher*

In *Chesher*, 678 F.2d at 1360–61, the Ninth Circuit held that an affidavit incorrectly naming Chesher as a member of the Hells Angels Motorcycle Club was made with reckless disregard for the truth because the affiant ignored several readily discoverable facts showing that Chesher was no longer a member of that Club.

Specifically, the affiant failed to uncover information that Chesher had been expelled from the Hells Angels even though another law enforcement agent had no trouble learning of Chesher's expulsion within months of its occurrence. *Id.* Indeed, the other law enforcement agent wrote a report explicitly stating that Chesher was no longer in the Hells Angels. *Id.* Furthermore, the affiant failed to uncover this report despite (i) the affiant's representations that he had investigated the Hells Angels for twelve years and (ii) the proffered fact that the affiant had spoken to the report's author on more than one occasion after the report was produced. *Id.* at 1361. Finally, the affiant based his assertion of Chesher's Hells Angels membership on information that was at least four years old. *Id.*

The Ninth Circuit reasoned that it was reckless for the affiant not to know that Chesher had been expelled from the Hells Angels because that knowledge was readily available, as evidenced by the facts that (i) another law enforcement agent found out about Chesher's expulsion within months of its occurrence, (ii) the agent wrote a report to that effect, and (iii) the affiant spoke to the agent about Chesher without uncovering that Chesher was no longer a Hells Angel. *Id.* at 1360–61. And with respect to the affiant's reliance on years-old information regarding Chesher's membership, the Ninth Circuit stated that the "use of information this out of date as a basis for an expression of [the affiant's] current belief tends to support a claim of recklessness." *Id.* at 1361. The affiant in this case clearly had reason to question whether Chesher was still a member of the Hells Angels, consistent with the Ninth Circuit's later articulation of reckless disregard requiring a "high degree of awareness of probable falsity." *Senchenko*, 133 F.3d at 1158.

*ii.        United States v. Burnes*

In *Burnes*, 816 F.2d at 1357–58, the defendant in a drug prosecution challenged as recklessly false, *inter alia*, an affiant's statements that (i) agents observed vehicles make a number of stops at the defendant's residence that lasted shorter than twenty minutes, and were therefore consistent with narcotics trafficking; and (ii) a plastic bottle seen in the possession of the defendant's associate probably contained ephedrine, which is an ingredient used to manufacture methamphetamine.  The defendant argued that the first statement was deliberately or recklessly false because an investigatory report from the affiant's same agency stated that many of the vehicles that stopped at his residence stayed for much longer than twenty minutes.  *Id.* at 1357.  And regarding the second statement that the bottle seen in the defendant's associate's possession probably contained a constituent ingredient for methamphetamine, the defendant argued that this was made with reckless disregard for the truth because "further investigation by the officers might have revealed that the chemical bottle obtained by the [defendant's associate] is not unique to ephedrine."  *Id.* at 1358.

The Ninth Circuit held that it was likely reckless for the affiant to mischaracterize the length of the vehicle stops at the defendant's house, because the report written by the investigating officers' agency clearly demonstrated the statement's factual falsity.  *Id.* at 1357–58 ("The Bureau of Narcotics Enforcement investigation report, however, indicates that occupants of only four vehicles stayed at the residence between five and twenty minutes.  The occupants of nine of the remaining vehicles stayed between twenty minutes and fifty minutes.  The occupants of two vehicles stayed for more than one hour.").  However, the averment regarding the contents of the plastic bottle that agents observed in the possession of the defendant's associate was not made recklessly.  *Id.* at 1358.  The Ninth Circuit held that "the most that can be said of the officers' failure to further investigate [the contents of the plastic bottle] is that they were negligent," because they came to their conclusion about the bottle's contents based on their experience and observations.  *Id.*  In doing so, the Ninth Circuit reiterated the rule that "[m]ere negligence in 'checking or recording the facts relevant to a probable-cause determination' is not sufficient to warrant a *Franks* hearing."  *Id.* (quoting *Franks*, 438 U.S. at 170) (citing *Brooklier*,

685 F.2d at 1221).

These holdings are consistent with the Ninth Circuit's later articulation of reckless disregard requiring a "high degree of awareness of probable falsity." *Senchenko*, 133 F.3d at 1158. Like in *Chesher*, the existence of the investigative report undermining the affidavit's representations of the frequency with which cars stopped at the defendant's house made the affiant's awareness of probable falsity highly likely. *Burnes*, 816 F.2d at 1357–58. Conversely, such awareness was not evident regarding the affidavit's statements as to the plastic bottle's contents because (i) there was no available affirmative indication undercutting the agents' conclusions, and (ii) the law does not compel an evidentiary hearing where an affiant simply fails to check all possible facts relevant to a probable cause determination. *Id.* at 1358.

### iii.    United States v. Dozier

In *Dozier*, 844 F.2d at 705–06, the probable cause affidavit supporting a search warrant in a drug investigation contained two affirmative misstatements. First, the affiant stated that the defendant had multiple drug-related convictions when he, in fact, had only a single conviction that had been set aside and dismissed. *Id.* at 705. Second, the affiant stated that a car observed on the defendant's property was registered to an individual who had been arrested for cultivating marijuana. *Id.* at 706. In reality, the affiant had previously verified with the DMV that the car in question was not registered to the individual claimed in the affidavit. *Id.*

The Ninth Circuit upheld the district court's decision finding that there was "no evidence that [the affiant's] conduct was intentional or reckless." *Id.* at 705. Regarding the first misstatement, because the affiant "simply did not know how to read the California rap sheets[,] the district court [properly] determined the misstatement was a product of negligence." *Id.* This is consistent with Ninth Circuit law that a finding of reckless disregard for the truth requires more than an affiant's mistake, and instead must be characterized by a "high degree of awareness of probable falsity." *Senchenko*, 133 F.3d at 1158. Regarding the second misstatement, the Ninth Circuit agreed that the affiant did not demonstrate reckless disregard for the truth even in the face of the district court's finding that it was "hard to reconcile [the affiant's] actual knowledge with his false statement" that was included in the affidavit. *Dozier*, 844 F.2d at 706. Though it does

not explicitly state as much, this holding suggests that even where it appears the affiant may have known that a statement included in an affidavit was false, that may still be insufficient to qualify as deliberately reckless because it does not evince a "high degree of awareness of probable falsity." *Senchenko*, 133 F.3d at 1158.

iv.      *United States v. Martinez-Garcia*

In *United States v. Martinez-Garcia*, 397 F.3d 1205, 1214–16 (9th Cir. 2005), the defendant challenged an affiant's failure to uncover certain information that allegedly would have demonstrated that the defendant's residence to be searched was not as closely connected to a drug distributor as the probable cause affidavit suggested. The affidavit in question stated that there was probable cause to believe drugs would be found at the defendant's residence because (i) an informant had actually seen the drug distributor dispensing methamphetamine at the residence, (ii) agents observed government informants entering the residence to purchase drugs, and (iii) government records reflected that the drug distributor lived at the residence. *Id.* at 1215–16. The defendant argued that further investigation by the affiant would have demonstrated that the drug distributor, in reality, no longer lived at the residence and had no control over it. *Id.* at 1214.

The Ninth Circuit held that the defendant failed to make a substantial preliminary showing of the affiant's reckless disregard for the truth, because even if it was true that the affiant could have uncovered additional information reducing the strength of the connection between the drug distributor and the residence in question, "[l]aw enforcement officers acting in reasonable reliance on tips from a reliable informant, corroboration through police observation and official driving records need not track down every piece of information that might potentially be relevant before filing a warrant affidavit." *Id.* at 1216. In contrast, the Ninth Circuit in the same case held that the affiant's failure to state that the informant was facing federal drug charges — charges for which prosecutors had agreed to recommend leniency in exchange for the informant's participation in the instant investigation — did constitute a substantial preliminary showing of reckless disregard for the truth. *Id.* (citing *Franks*, 438 U.S. at 171–72). The fact that the affiant's knowing omission of this information from his affidavit was "uncontroverted," *id.*, strongly suggests that it met the Ninth Circuit's "high degree of awareness of probable falsity"

15

1    standard, *Senchenko*, 133 F.3d at 1158.

2                    B.    <u>Materiality and Probable Cause</u>

3          Even if a defendant makes a substantial preliminary showing of deliberately or recklessly

4    false misstatements included in a warrant affidavit, those misstatements must still be material.

5    *Bennett*, 219 F.3d at 1124.  "Knowing or reckless falsehoods . . . are immaterial when the

6    affidavit would still support probable cause after the purported falsehoods are removed . . . ."

7    *United States v. Christensen*, 624 F. App'x 466, 474 (9th Cir. 2015) (citing *United States v.*

8    *Garcia-Cruz*, 978 F.2d 537, 541 (9th Cir. 1992)).

9          Determining whether probable cause exists for a search warrant requires a neutral

10   magistrate to make "a practical, common-sense decision whether, given all the circumstances set

11   forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be

12   found in a particular place."  *United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011)

13   (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).  The standard is the same for the

14   probable cause required before a warrantless arrest is valid.  *Devenpeck v. Alford*, 543 U.S. 146,

15   152 (2004) ("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment

16   where there is probable cause to believe that a criminal offense has been or is being committed.").

17   This same probable cause, of course, is also required before an arrest warrant may issue.  Fed. R.

18   Crim. P. 4(a).  However, "the standard for probable cause is not terribly demanding," and in the

19   context of an arrest it "merely asks whether, under the totality of the circumstances, a prudent

20   officer would have believed that there was a fair probability that [the defendant] committed a

21   crime."  *United States v. Collins*, 427 F.3d 688, 691 (9th Cir. 2005).  Indeed, "the duty of a

22   reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . .

23   conclud[ing]' that probable cause existed."  *Krupa*, 658 F.3d at 1177 (alterations in original)

24   (quoting *Jones*, 362 U.S. at 271).  And the law, of course, is clear that "a magistrate's

25   determination of probable cause should be paid great deference by reviewing courts."  *Id.*

26         The Ninth Circuit has held that probable cause exists in narcotics distribution cases where

27   (i) law enforcement agents monitor controlled drug purchases from drug dealers and their

28   associates, (ii) these conspirators are observed interacting with one another in close temporal

proximity to controlled purchases, and (iii) these conspirators employ counter-surveillance driving techniques around the same time. *United States v. Chavez-Miranda*, 306 F.3d 973, 977–78 (9th Cir. 2002). Furthermore, under circumstances such as these where a surveillance target is "reasonably suspected of supplying the [narcotics]," a search warrant for evidence or contraband related to narcotics distribution in the target's residence will be upheld. *Id.* at 978. And with respect to installation of a GPS tracking device on a vehicle, courts have found probable cause where a law enforcement agent's affidavit combines (i) a modicum of evidence showing communication between the driver of a target vehicle and the subject of a narcotics investigation with (ii) the affiant's experience establishing that such evidence is indicative of criminality. *See United States v. Garcia-Lopez*, No. CR-13-01609-001-PHX, 2015 WL 2152766, at *2 (D. Ariz. May 6, 2015).

### III. ANALYSIS

Defendants' motions to suppress must be denied because they fail to show that Defendants are entitled to a *Franks* evidentiary hearing. First, Defendants fail to meet their burden to make a substantial preliminary showing that the misidentification of Padilla as Blanks was anything more than a negligent mistake. *See Franks*, 438 U.S. at 155–56, 171. Second, they fail to demonstrate that Agent Anderson's affidavits, once purged of the erroneous identification of Padilla as Blanks, were insufficient to supply probable cause to track the 1996 Chevrolet Impala or search the two residences listed on the warrants. *Id.* at 171–72 ("[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.").

#### A. Negligent Misidentification of Padilla

The available evidence establishes, at most, that Agent Anderson was negligent when she included in her probable cause affidavits a mistaken identification of Padilla as Blanks. Nothing in the record demonstrates that she had the requisite "high degree of awareness of probable falsity" necessary to merit a *Franks* hearing. *Senchenko*, 133 F.3d at 1158.

##### i. Initial Misidentification of Padilla

Agent Anderson's probable cause affidavit makes it clear that there were multiple data

points suggesting that Blanks, not Padilla, was the person driving the 1996 Chevrolet Impala during law enforcement surveillance in late 2017. The Impala's DMV registration was in Blanks's name at an address used by Blanks. (ECF No. 1 ¶¶ 18, 35, Apr. 9, 2018.) The driver of the Impala identified himself as Blanks to a Sacramento Police Department officer during an apparently unrelated proactive contact with the driver (ECF No. 1 ¶ 24, Apr. 9, 2018), a proactive contact that occurred on the same day that federal agents observed the driver engage in activity consistent with narcotics distribution (ECF No. 1 ¶¶ 16–21, Apr. 9, 2018). Furthermore, Padilla's appearance on October 25, 2017, was consistent with the data regarding Blanks's appearance in the DMV database that agents used to make their initial erroneous identification. (ECF No. 1 ¶ 23, Apr. 9, 2018.) The DMV database listed Blanks as five feet, eleven inches tall and weighing more than 200 pounds. (ECF No. 43-1 at 54.) The database further demonstrated that Blanks had a shaved head at the time his photograph was taken. (ECF No. 43-1 at 54.) Padilla's physical appearance at the time he was photographed with Romero inside the O'Reilly Auto Parts store on October 25, 2017, was similar in that he appeared to be about six feet tall and over 200 pounds. (ECF No. 43-1 at 56, 58.) While not entirely bald, Padilla's hair was not so outgrown on this date that it would have caused a reasonable person to question whether Padilla was a different man from the individual in the driver's license he provided to local law enforcement. (ECF No. 43-1 at 56, 58; ECF No. 1 ¶ 24, Apr. 9, 2018.)

The Court also notes that it has observed Padilla in person more than once, and has compared his in-court appearance to the DMV database image of Blanks that the DEA agents used to identify him. (*See* ECF No. 43 at 6; ECF No. 43-1 at 54.) Padilla's appearance is more than sufficiently similar to Blanks's DMV image such that a reasonable person could believe they are one and the same individual. (*Compare* ECF No. 43-1 at 54, *with* ECF No. 43-1 at 58); *cf. Rivera v. Cty. of L.A.*, 745 F.3d 384, 389 (9th Cir. 2014) (holding that probable cause existed to arrest a suspect where the "height and weight descriptors associated with the warrant, although not matching [the suspect] exactly, were within one inch and ten pounds of [the suspect's] true size"); *Neylon v. Cty. of Inyo*, No. 1:16-CV-0712 AWI JLT, 2018 WL 3740535, at *7 (E.D. Cal. Aug. 3, 2018) (concluding that two individuals who shared "the same gender, a similar build,

three prior names, one purported birthday, are of a similar age, and can be described as being of the same race" were sufficiently similar to support a reasonable belief they were the same person). Based on its own percipient knowledge, the Court simply disagrees with Defendants' conclusions that Blanks and Padilla are physically dissimilar. (*See* ECF No. 36 at 6 ("A simple look at a DMV photo of Mr. Blanks would have revealed that he and Mr. Padilla were not the same individual."); ECF No. 39 at 5 (arguing that "Blanks and Padilla do not look alike")).) To the contrary, the Court finds that the available photographic evidence is a compelling indication that Agent Anderson's misidentification of Padilla as Blanks was nothing more than "negligence or innocent mistake." *Franks*, 438 U.S. at 171; *see also Burnes*, 816 F.2d at 1358 ("Mere negligence in 'checking or recording the facts relevant to a probable-cause determination' is not sufficient to warrant a *Franks* hearing." (quoting *Franks*, 438 U.S. at 170) (citing *Brooklier*, 685 F.2d at 1221)).

The Court's conclusion in this regard is supported by the Ninth Circuit's holding in *Dozier*, 844 F.2d at 705, that it was not reckless for an affiant to inaccurately state that the defendant in a narcotics investigation had multiple drug-related prior convictions. It was negligence, not reckless disregard for the truth, for the affiant in that case to overstate the number of the defendant's prior drug convictions because the affiant "simply did not know how to read the California rap sheets." *Id.* A rap sheet is composed of objective conviction data which yields a binary answer to the question of how many prior convictions are associated with a particular defendant. While it is true that the question of whether Padilla is the person depicted on Blanks's driver license also yields a binary answer, the visual information that Agent Anderson and her colleagues interpreted in misidentifying Padilla as Blanks is much more subjective and open to varying degrees of interpretation than is the information on a criminal rap sheet. It includes data points like skin tone, eye placement, hair style, body weight, and height. (*See* ECF No. 43-1 at 54, 56, 58.) If it was not reckless disregard for the truth for the *Dozier* affiant to misinterpret objective data contained in a defendant's printed criminal history, it was not reckless for the DEA team in this case to arrive at an inaccurate identification based on visual data that is more subjective and calls for more nuanced interpretive conclusions.

Furthermore, Agent Anderson is not the only person who misidentified Padilla as Blanks. The Sacramento Police Department officer who contacted the Impala's driver on October 25, 2017, appeared to make the same mistake Agent Anderson did.  (ECF No. 1 ¶ 24, Apr. 9, 2018.) So did the other federal agents on surveillance that day.  (ECF No. 1 ¶ 23, Apr. 9, 2018; *see also* ECF No. 43 at 2.)  This distinguishes the instant case from *Chesher*, on which Defendants rely. (*See* ECF No. 36 at 5.)  The reckless disregard for the truth in *Chesher*, 678 F.2d at 1360–61, came from the affiant's failure to uncover the facts about the defendant's Hells Angels membership despite the affiant speaking with another law enforcement officer who knew those facts and had written a report incorporating those facts.  Contrastingly, Defendants in the instant case present no evidence that any law enforcement agent knew of Padilla's correct identity at the time of Agent Anderson's April 9 affidavit.  *See Franks*, 438 U.S. at 155–56 (requiring a defendant's offer of proof of reckless disregard at this stage to be "substantial").  And while *Chesher* does not stand for the proposition that such proof is a prerequisite for a finding of reckless disregard, the fact that there is zero evidence that any non-affiant officer had knowledge of Padilla's correct identity undermines *Chesher*'s applicability here.  (*See* ECF No. 1 ¶¶ 23–24, Apr. 9, 2018.)  Along the same lines, the fact that Agent Anderson simply made the same mistake that an unaffiliated Sacramento Police Department officer made further undercuts Defendants' contention that the misidentification of Padilla as Blanks had a sinister motive or was driven purely by a desire to effectuate an arrest.  (*See* ECF No. 36 at 7–9.)

Application of the Ninth Circuit's holding in *Burnes*, 816 F.2d at 1357–58, also compels the Court's conclusion.  The reckless disregard for the truth found in *Burnes* was a product of the affiant including in a probable cause affidavit information about the frequency of vehicle visits to a suspected drug distributor's house — information that was directly contradicted by a written investigation report prepared by the same agency to which the affiant belonged.  *Id.*  In the instant case, there is no evidence that anyone within the DEA — or within the Sacramento Police Department, for that matter — possessed information contrary to what Agent Anderson and her colleagues believed regarding the identity of the Impala's driver.  (*See* ECF No. 1 ¶¶ 23–24, Apr. 9, 2018.)  Indeed, all the agents associated with the DEA and the Sacramento Police Department

came to the same conclusion that Blanks was the Impala's driver on October 25, 2017. (ECF No. 1 ¶¶ 23–24, Apr. 9, 2018.) It is hard to see how Agent Anderson could have acted with a "high degree of awareness of probable falsity," *Senchenko*, 133 F.3d at 1158, when — unlike the affiants in *Chesher*, 678 F.2d at 1360–61, and *Burnes*, 816 F.2d at 1357–58, who ignored readily available contradictory information — Agent Anderson made the same mistake as her fellow officers based on the same available information regarding the Impala's driver's identity.

For the reasons set forth above, Defendants fail to make a substantial preliminary showing, *see Franks*, 438 U.S. at 155–56, 171 (requiring a substantial preliminary showing of more than mere negligence), that Agent Anderson and her colleagues misidentified the Impala's driver in the face of a "high degree of awareness of probable falsity" on October 25, 2017, *Senchenko*, 133 F.3d at 1158. Accordingly, Defendants are not entitled to a *Franks* hearing on the topic of agents' initial misidentification of the driver of the 1996 Chevrolet Impala on October 25, 2017.

### ii. Subsequent Failure to Correct Initial Misidentification

Defendants argue that even if Agent Anderson's initial misidentification was a mere mistake, it was still reckless disregard for the truth for the DEA team to fail to correct it over the remainder of its investigation. (*See* ECF No. 36 at 6 ("Agent Anderson was surveilling Mr. Romero for months. She saw him meet with the driver of the Impala on multiple occasions. It is well within the investigative power of the Drug Enforcement Agency [sic] to verify the identity of a suspect."); ECF No. 45 at 2 ("Moreover, the affiant, here, identifies Mr. Blanks, not once or twice, but repeatedly over the course of a seven-month investigation.").) Ninth Circuit authority compels a contrary conclusion.

In *Burnes*, 816 F.2d at 1357–58, the Ninth Circuit found it to be simple negligence where a law enforcement agent concluded, based primarily on its shape, that a bottle carried by the defendant's associate contained ephedrine without investigating whether the bottle could have been full of some other substance. Though the affiant certainly could have done more investigatory work to discern whether the bottle did, in fact, contain ephedrine, the affidavit still withstood a *Franks* challenge because "the conclusion as to the contents of the bottle was made

1    based on the observations and the combined experience of two veteran narcotics investigators."

2    *Id.* at 1358.  Here, Agent Anderson's repeated misidentification of Blanks as the Impala's driver

3    was also based on conclusions derived from her own observations and from those of fellow law

4    enforcement officers.  (ECF No. 1 ¶¶ 22–24, Apr. 9, 2018.)  While the surveillance team could

5    have done more to "check[] or record[] the facts relevant to [Agent Anderson's] probable cause

6    determination" by re-verifying its identification of Blanks every time he appeared during the

7    team's surveillance, their failure to do so does not make Agent Anderson more reckless than the

8    affiant in *Burnes* who similarly could have engaged in more investigatory spadework prior to

9    concluding that ephedrine was probably in the bottle he observed.  *Burnes*, 816 F.2d at 1358

10   (quoting *Franks*, 438 U.S. at 170).

11       The Ninth Circuit's reasoning in *Martinez-Garcia* compels the same conclusion.  It was

12   not reckless for the affiant in that case to state that there was probable cause to believe evidence

13   of narcotics crimes would be found at a residence, even though a known drug distributor's

14   connection to that residence was somewhat weakened by facts suggesting he did not actually live

15   there.  *Martinez-Garcia*, 397 F.3d at 1215–16.  The affidavit in that case was not made recklessly

16   because the probable cause it established was based on other pieces of reliable data, such as tips

17   from informants who had visited the residence multiple times and corroboration through official

18   police and driving records, *id.*, and "[l]aw enforcement officers acting in reasonable reliance on

19   [such information] need not track down every piece of information that might potentially be

20   relevant before filing a warrant affidavit," *id.* at 1216.  Thus, even if Agent Anderson harbored

21   doubts that Blanks was the Impala's driver being surveilled by the DEA team in late 2017 and

22   early 2018 — and there is no evidence she did have any such doubts until the warrants were

23   executed in April 2018 (*see* ECF No. 43 at 2) — the fact that the team's initial identification of

24   the driver was based on informant tips (ECF No. 1 ¶ 12, Apr. 9, 2018) and official driving records

25   (ECF No. 1 ¶¶ 18, 23, Apr. 9, 2018) meant that the team was under no subsequent obligation to

26   go searching for information that might undercut its initial identification, *see Martinez-Garcia*,

27   397 F.3d at 1216.  Indeed, even where an affiant includes false information in an affidavit after

28   actually doing the kind of investigative spadework that Defendants accuse Agent Anderson of

failing to perform, this can nonetheless fail to demonstrate reckless disregard for the truth. *See Dozier*, 844 F.2d at 706 (finding that the affiant's conduct did not constitute reckless disregard for the truth even where an affidavit stated — contrary to information discovered by the affiant through a DMV check — that cars registered to drug suspects were located on the defendant's property).

Finally, the DEA investigative agents acted reasonably in this instance despite their failure to amend their identification of the Impala's driver as Blanks, and "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381–82 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Once agents made a positive identification of Blanks based on personal observation of the Impala's driver and reliable public databases (*see* ECF No. 1 ¶¶ 16–18, 22–24, Apr. 9, 2018), from that point forward during the investigation they referred to the individual driving the Impala as such (*see, e.g.*, ECF No. 1 ¶¶ 35, 37, 39, 52, 54, 67–71, Apr. 9, 2018). This is reasonable and is consistent with general law enforcement behavior. Few officers, once they identify a suspect, will reconsider their identification every subsequent time they observe the suspect absent a reason to do so. *See Cameron v. Craig*, 713 F.3d 1012, 1019 (9th Cir. 2013) ("Once probable cause is established, 'an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused.'" (quoting *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003))). This is particularly true in narcotics cases where many of law enforcement's observations of their targets occur at a distance. (*See, e.g.*, ECF No. 1 ¶¶ 52, 70, Apr. 9, 2018.) There is a good reason why this is so: law enforcement officers are reasonably more focused on observing the suspect's actions (*see, e.g.*, ECF No. 1 ¶¶ 55, 57, Apr. 9, 2018) and avoiding detection (*see, e.g.*, ECF No. 1 ¶¶ 70–71, Apr. 9, 2018) than they are on re-checking all of their predicate conclusions made in their investigation thus far.

This, combined with the "presumption that an affidavit in support of a search warrant is valid," *Meek*, 366 F.3d at 716 (citing *Franks*, 438 U.S. at 171), compels the conclusion that it was not reckless disregard for the truth characterized by a "high degree of awareness of probable falsity," *Senchenko*, 133 F.3d at 1158, for Agent Anderson's probable cause affidavit to

1    repeatedly misidentify Padilla as Blanks following the events of October 25, 2017.

2                              iii.        *Hessee Investigation Report*

3          Nothing in the report from Robert Hessee (ECF No. 53-1) alters the above conclusions.

4    The most the Hessee report establishes is the theoretical possibility that law enforcement agents

5    may have observed the true Anthony Blanks, instead of the true Salvador Padilla who agents

6    mistakenly thought was Blanks, driving the Impala on October 25, 2017.  (ECF No. 53-1 at 1

7    (stating that Blanks owns the Impala in question, drove it frequently between October 2017 and

8    March 2018, and may have driven it to the O'Reilly Auto Parts store on October 25, 2017, but

9    cannot remember specifically whether he did so).)  This report, which presumably represents

10   Padilla's most convincing evidence that it may have actually been Blanks — not Padilla

11   misidentified as Blanks — who agents observed on October 25, 2017 (*see* ECF No. 53 at 1

12   ("Should the Court have granted an evidentiary hearing, the defense would have sought to

13   introduce this information [contained in the Hessee report] through witnesses."), is certainly not a

14   "substantial" preliminary showing of reckless disregard for the truth sufficient to merit an

15   evidentiary hearing, *Franks*, 438 U.S. at 155.  For as the Court previously noted, it has had ample

16   opportunity to compare Padilla's in-court appearance with the photograph taken of Padilla inside

17   the O'Reilly Auto Parts store on October 25, 2017 (*see* ECF No. 43-1 at 58), and finds that there

18   can be no reasonable dispute that Padilla is that person.  Accordingly, even if Blanks did attest

19   that he definitely drove his Impala to the O'Reilly Auto Parts store at some point on October 25,

20   2017 — which, of course, Blanks does not do (ECF No. 53-1 at 1 ("Anthony does not remember

21   the specific date that he drove the car to and from O'Reilly auto parts . . . .")) — the Court would

22   still find that the person agents observed engaging in activities suggestive of narcotics distribution

23   on that date (*see, e.g.*, ECF No. 1 ¶¶ 20–22, 25–26, Apr. 9, 2018), and thereafter photographed

24   inside the O'Reilly Auto Parts store (ECF No. 1 ¶ 23, Apr. 9, 2018; ECF No. 43-1 at 58), was

25   Padilla.

26         Additionally, to the extent Padilla proffered the Hessee report to demonstrate that the

27   DEA team may have unwittingly observed the true Anthony Blanks during the controlled

28   purchases that occurred on December 4, 2017, and February 13, 2018, the report again fails to

                                                   24

rise to the required level of being a "substantial" preliminary showing that agents'

misidentification of their target on those dates was reckless. *Franks*, 438 U.S. at 155. The

Hessee report states that Blanks drove his Impala to "places like DMV, smog check, and does

remember O'Reilly auto parts." (ECF No. 53-1 at 1.) Nowhere does Blanks suggest that on

December 4, 2017, he may have driven the Impala from Padilla's residence to Romero's

residence at 2930 32nd Avenue in Sacramento, to the Michoacano restaurant on Franklin

Boulevard, or to the taqueria on the northwest corner of Franklin Boulevard and Fruitridge Road,

each of which are locations where surveillance teams saw the Impala on that day prior to Romero

selling methamphetamine to an undercover agent. (*See* ECF No. 1 ¶¶ 35–42, Apr. 9, 2018.) Nor

does Blanks intimate that on February 13, 2018, he could have driven the Impala from Padilla's

residence to any of the locations where Padilla was observed interacting with Romero or riding in

Mendez's vehicle prior to another controlled methamphetamine purchase. (*See* ECF No. 1 ¶¶ 50,

52, 54–58, Apr. 9, 2018.) Finally, nowhere in the Hessee report does Blanks imply that he was

ever at the location on Sunrise Mist Way where, on March 6, 2018, agents saw the individual they

thought was Blanks allegedly attempting to hide the Impala from law enforcement surveillance.

(*See* ECF No. 1 ¶¶ 67–71, Apr. 9, 2018.) Just because Blanks may have driven the Impala to the

DMV, to get a smog test, or to O'Reilly Auto Parts over a five-month period (*see* ECF No. 53-1

at 1) says next to nothing about whether he may have been in the Impala on the specific days and

at the specific locations set forth in Agent Anderson's probable cause affidavit.

This conclusion is underscored by the fact that the Hessee report reveals no connection

between Blanks and the cellular phone numbers that Agent Anderson's affidavit connected to

Romero and Padilla. (*See* ECF No. 53-1 at 1 ("Anthony Blanks does not know and has never

heard of 'Nick Cole.'").) These numbers were central to the affidavit's factual predicate

establishing probable cause because of the frequency and temporal proximity with which they

communicated with Romero while agents observed the individual they thought was Blanks

coming and going from Romero's residence around the time Romero sold methamphetamine to

an undercover agent. (*See* ECF No. 1 ¶¶ 25–26, 43–48, 81–86, Apr. 9, 2018.) That Blanks had

nothing to do with these cellular phone numbers makes it even less likely — indeed, vanishingly

so — that agents actually saw the true Anthony Blanks do the things that Agent Anderson's April 10 affidavit eventually attributed to the true Salvador Padilla.

Thus, concluding that the evidence from the Hessee report merits a *Franks* hearing to determine whether Agent Anderson's affidavit recklessly identified Padilla as Blanks would eviscerate the requirement that Padilla first make a "substantial preliminary showing," *Franks*, 438 U.S. at 155, that agents' misidentification of Padilla was made with a "high degree of awareness of probable falsity," *Senchenko*, 133 F.3d at 1158.

### iv.    Disposition

For the reasons set forth above, the Court finds that Defendants fail to meet their burden to produce sufficient evidence suggesting that the misidentification of Padilla as Blanks in Agent Anderson's affidavit was anything more than negligent. *Franks*, 438 U.S. at 155–56 (requiring "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit"). This finding alone is a sufficient basis to warrant denial of Defendants' motions (ECF No. 36; ECF No. 39). *Franks*, 438 U.S. at 171 ("Allegations of negligence or innocent mistake are insufficient."); *Bennett*, 219 F.3d at 1124 ("A defendant is entitled to a *Franks* hearing only if he makes a two-fold showing: intentional or reckless inclusion or omission, and materiality.").

### B.    Materiality

Even if the misidentification in Agent Anderson's affidavit had been made with reckless disregard for the truth, Defendants' motions would still fail. This is because, as set forth below, the name utilized to refer to the individual now known to be Padilla is immaterial in the sense that "the affidavit would still support probable cause after the purported falsehoods [i.e., the misidentification of Padilla and related information] are removed." *Christensen*, 624 F. App'x at 474 (citing *Garcia-Cruz*, 978 F.2d at 541).

### i.    Evidence of Padilla's Participation in Narcotics Trafficking Conspiracy

Excised of the information relating to the misidentification of Padilla as Blanks, Agent Anderson's affidavit sets forth facts that are sufficient to establish probable cause that evidence of

narcotics crimes would be found at the locations and in the vehicles listed within it. (*See* ECF No. 1 ¶ 1, Apr. 9, 2018.) This is because, following the DEA team's initial misidentification of the Impala's driver as Blanks, the "Blanks" moniker acted as merely a shorthand label that Agent Anderson's affidavit used to refer to the individual that she and her colleagues observed engaging in multiple activities consistent with illegal narcotics trafficking. (*See* ECF No. 36 at 7 ("The information [in the April 10, 2018 probable cause affidavit] was virtually the same beyond the agent changing the name Anthony Blanks to Salvador Padilla in every instance . . . .").) The evidence is clear that this particular person — whether referred to as "Blanks," "Padilla," "driver of a 1996 Chevrolet Impala with distinctive rims," "O'Reilly Auto Parts customer photographed by DEA agents on October 25, 2017," or by any other label — is the individual the DEA team surveilled who played a central role in the targeted drug distribution conspiracy. There is simply nothing specific to Anthony Blanks that was material to the probable cause established by Agent Anderson's affidavit, which stated that the DEA team began surveilling the Impala and its driver based on a reliable tip from an informant that the team's target — Romero — received his drugs from a supplier who drove the Impala and lived in Romero's neighborhood. (ECF No. 1 ¶ 12, Apr. 9, 2018.) The DEA team was not alerted to the Impala's importance because it was registered in Blanks's name or at an address associated with Blanks. (*See* ECF No. 1 ¶¶ 12, 16–17, Apr. 9, 2018 (describing the DEA team's initial contact with the then-unidentified driver of the Impala).) Following this initial tip, the Impala's driver's actions — not his name or criminal history or whether he was associated with a gang (ECF No. 1 ¶¶ 24, 30–31, Apr. 9, 2018) — created the probable cause to believe that he was involved in a narcotics distribution conspiracy.

Specifically, on October 25, 2017, the Impala's driver left his residence at 5120 25th Street and drove to Romero's residence ten minutes prior to a scheduled controlled purchase of methamphetamine from Romero by the DEA team's informant. (ECF No. 1 ¶¶ 13–16, Apr. 9, 2018.) Romero and the Impala's driver met with one another at Romero's residence. (ECF No. 1 ¶ 16, Apr. 9, 2018.) After this brief meeting with Romero, the Impala's driver engaged in counter-surveillance driving maneuvers on his way back to his residence at 5120 25th Street. (ECF No. 1 ¶¶ 17, 20, Apr. 9, 2018.) The DEA's informant purchased methamphetamine from

Romero shortly after that. (ECF No. 1 ¶ 19, Apr. 9, 2018.) The Impala's driver then returned to Romero's residence in the Impala, picked up Romero, and the two of them went to the O'Reilly Auto Parts store together. (ECF No. 1 ¶¶ 20–23, Apr. 9, 2018.) All this occurred on the same day that Romero and a phone number falsely registered to "Nick Cole" engaged in extensive communications in close temporal proximity to the controlled purchase. (ECF No. 1 ¶¶ 25–26, 43, Apr. 9, 2018.) Agent Anderson's affidavit stated that based on her training and experience, "individuals who traffic in narcotics often provide false names when subscribing telephone numbers to avoid law enforcement detection." (ECF No. 1 ¶ 26, Apr. 9, 2018.)

Much the same occurred on December 4, 2017. Following a request for drugs from an undercover agent to Romero (ECF No. 1 ¶¶ 32–33, Apr. 9, 2018), Romero communicated with a phone number falsely registered to "Nick Cole" (ECF No. 1 ¶¶ 44–46, Apr. 9, 2018) around the same time the Impala's driver left his residence at 5120 25th Street and drove to Romero's residence (ECF No. 1 ¶¶ 35, 46, Apr. 9, 2018). After a brief meeting between the Impala's driver and Romero outside Romero's residence, Romero told the undercover agent that the methamphetamine would be available by 6:00 p.m. that night. (ECF No. 1 ¶¶ 35–36, Apr. 9, 2018.) Around that appointed time, the driver once again left his residence in the Impala and made a number of stops around South Sacramento before driving to Romero's residence. (ECF No. 1 ¶ 39, Apr. 9, 2018.) The undercover agent's purchase of methamphetamine from Romero occurred around the same time the Impala's driver returned to his residence at 5120 25th Street (ECF No. 1 ¶ 41, Apr. 9, 2018), which the driver then left once again shortly after Romero called another phone number also registered to "Nick Cole" (ECF No. 1 ¶¶ 47–48, Apr. 9, 2018). The Impala's driver and Romero met one another at an Express Mart Food Store a matter of minutes following this controlled purchase and telephonic communication. (ECF No. 1 ¶ 47, Apr. 9, 2018.)

This same general pattern of behavior largely occurred again on February 13, 2018. The undercover government agent requested methamphetamine from Romero, followed shortly thereafter by telephonic communication between Romero and a phone number registered to "Nick Cole." (ECF No. 1 ¶ 53, Apr. 9, 2018.) The Impala's driver then drove the vehicle to Romero's

residence, where the two men met in person. (ECF No. 1 ¶ 55, Apr. 9, 2018.)  Romero then

confirmed with the government agent that Romero would have the requested methamphetamine

shortly.  (ECF No. 1 ¶ 56, Apr. 9, 2018.)  However, on this date as opposed to the other

controlled purchases, the Impala's driver did not meet with Romero again prior to the controlled

purchase.  This time, the Impala's driver met first with Mendez, who drove to Romero's

residence directly after meeting with the Impala's driver.  (ECF No. 1 ¶¶ 57–59, Apr. 9, 2018.)

Once Mendez met with Romero there and left, Romero contacted the government agent and sold

the agent methamphetamine.  (ECF No. 1 ¶¶ 60–61, Apr. 9, 2018.)  Mendez then returned to

Romero's residence.  (ECF No. 1 ¶ 62, Apr. 9, 2018.)

    The Ninth Circuit's holding in *Chavez-Miranda* illustrates why the above facts establish

probable cause for the issuance of the warrants in this case.  In *Chavez-Miranda*, 306 F.3d at 978,

the defendant/supplier appeared numerous times with a drug dealer in connection with, and in

close proximity to, controlled drug purchases.  Indeed, the dealer more than once informed the

controlled purchaser that he had heroin to sell within minutes of the defendant/supplier's arrival

at the dealer's residence.  *Id.*  The same is largely true of the Impala's driver on the two dates in

late 2017 on which DEA agents observed him meet with Romero prior to controlled

methamphetamine purchases.  (ECF No. 1 ¶¶ 16, 19, 39–40, Apr. 9, 2018.)  In *Chavez-Miranda*,

306 F.3d at 978 (quoting *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991)), the

defendant/supplier "employed counter-surveillance driving techniques, which [the Ninth Circuit

has] recognized as being 'indicative of narcotics distribution.'"  Similarly, the Impala's driver

appeared to attempt evading government observation via counter-surveillance driving.  (ECF No.

1 ¶ 17, Apr. 9, 2018.)  If anything, the Impala's driver expended more time and energy on

counter-surveillance than the defendant/supplier in *Chavez-Miranda*, because the Impala's driver

went so far as to attempt to identify and photograph surveilling DEA agents.  (ECF No. 1 ¶¶ 52,

70–71, Apr. 9, 2018.)  Finally, the defendant/supplier in *Chavez-Miranda*, 306 F.3d at 978–79,

traveled to and from his residence at times consistent with heroin being stored there before

delivering it to the dealer.  This is notably similar to the Impala's driver's itinerary on December

4, 2017, when he met with Romero shortly after Romero received a request for drugs, drove back

to his residence, then returned to Romero's residence at around the same time that Romero was due to sell the methamphetamine.  (ECF No. 1 ¶¶ 35–42, Apr. 9, 2018.)  It also parallels what occurred on October 25, 2017, when the Impala's driver appeared at Romero's residence less than an hour prior to a planned controlled purchase of methamphetamine.  (ECF No. 1 ¶¶ 16, 19, Apr. 9, 2018.)

The Court also notes that Agent Anderson's affidavit provides more detail of the Impala's driver's involvement in suspected narcotics trafficking than what was found to "easily establish[] probable cause" in *Chavez-Miranda*, 306 F.3d at 978.  This additional detail includes: telephonic evidence suggesting that the Impala's driver was utilizing a number of cellular phone numbers registered using fake information (*e.g.*, ECF No. 1 ¶¶ 81–86, Apr. 9, 2018); evidence that the Impala's driver had concealed the Impala under a tarp at a different address from his residence, which officers reasonably interpreted to be an "attempt[] to hide his vehicle from law enforcement officers" (ECF No. 1 ¶ 69, Apr. 9, 2018); and evidence that the Impala's driver tried to identify and photograph surveilling DEA agents (ECF No. 1 ¶¶ 52, 70–71, Apr. 9, 2018).

Given the above, it is clear that Agent Anderson's April 9 probable cause affidavit — once excised of all information relating to Blanks's identity — still contains sufficient evidence establishing probable cause to believe that searching the Impala's driver's residence at 5120 25th Street would yield evidence of an ongoing narcotics distribution conspiracy.  *See Chavez-Miranda*, 306 F.3d at 978–79 (holding that repeated proximity to narcotics distribution along with counter-surveillance maneuvers can "easily establish[] probable cause for the issuance of a search warrant for" the residence of an alleged drug supplier).

ii.     *November 27, 2017 Affidavit in Support of Application for GPS Tracking Warrant*

Defendants specifically challenge Agent Anderson's November 27, 2017 affidavit as failing to establish probable cause to install a GPS tracking device on the Impala.  (*See* ECF No. 36 at 7–9; ECF No. 39 at 5–6.)[5]  According to Defendants, the lack of probable cause underlying

---

[5]     Though the full affidavit in support of the application for a GPS tracking warrant remains under seal, the Court notes that Defendants' unsealed motion papers themselves reference generally the contents of that tracking warrant affidavit.  (*See* ECF No. 36 at 7; ECF No. 39 at 4–5 ("The search warrants utilized the same facts it used in

1  this first tracking warrant requires most of the subsequent evidence obtained in the investigation
2  to be suppressed as fruit of the poisonous tree.  (ECF No. 36 at 9; ECF No. 39 at 5.)

3      Defendants' argument fails because Agent Anderson's November 27, 2017 affidavit still
4  established probable cause, once stripped of information relating to Padilla's misidentification as
5  Blanks, to believe that the 1996 Impala was being used to engage in illegal activities related to
6  drug trafficking.  *See Christensen*, 624 F. App'x at 474; (ECF No. 39-1 at 5).  As set forth above,
7  the facts known to the DEA team in October and November 2017 consisted generally of the
8  following: a reliable tip from an informant that the Impala's driver served as Romero's source of
9  drug supply and lived near Romero (ECF No. 1 ¶ 12, Apr. 9, 2018); telephonic and in-person
10  communication between the Impala's driver and Romero close in time to when the informant
11  purchased methamphetamine from Romero (ECF No. 1 ¶¶ 16, 20–23, 25–26, Apr. 9, 2018);
12  counter-surveillance driving engaged in by the Impala's driver as he departed Romero's residence
13  (ECF No. 1 ¶ 17, Apr. 9, 2018); and Agent Anderson's conclusion after years of experience
14  investigating illegal narcotics activity that the Impala was being used to ferry narcotics to Romero
15  (ECF No. 1 ¶¶ 3–5, 90, Apr. 9, 2018).

16      That this factual predicate would be sufficient to meet the "not terribly demanding"
17  threshold to establish probable cause for installation of a GPS tracking device on the Impala,
18  *Collins*, 427 F.3d at 691, is illustrated by *Chavez-Miranda* (the applicability of which the Court
19  explained above) and *Garcia-Lopez*.  In *Garcia-Lopez*, 2015 WL 2152766, at *2, agents used
20  "records lawfully obtained from the phone company, the motor vehicles department, and" a local
21  port of entry to determine that "someone driving [the defendant's] car spoke over the phone with
22  the target of an ongoing drug investigation."  Agents listened in a few days later as the defendant,
23  using coded language that apparently referred to narcotics as "beans," spoke to the investigation
24  target.  *Id.* at *1–2.  Noting that the coded language used by the defendant and the investigation
25  target "could well refer to perfectly innocuous activity," the court nonetheless credited the
26  investigating agent's interpretation that the code referred to drug transactions.  *Id.* at *2.

27

28  its prior tracking warrant applications, including its identification of Blanks, along with new allegations from its
   recent investigative activities.").)

1  Accordingly, the court upheld the validity of a warrant authorizing installation of a GPS tracking

2  device on the defendant's vehicle that had been supported by this probable cause showing. *Id.* at

3  *2–3.

4      Agent Anderson's November 27, 2017 probable cause showing is, if anything, stronger

5  than that found to establish probable cause in *Garcia-Lopez*. First, Agent Anderson's affidavit

6  did not need to rely on triangulating various publicly available records to implicate the Impala in

7  a drug trafficking scheme, as the agents in *Garcia-Lopez*, 2015 WL 2152766, at *2, had to do.

8  This is because Agent Anderson had something better: a particularized tip from an informant

9  considered to be reliable who was familiar with the drug trafficking organization being

10 investigated and who told agents that Romero's supplier lived in Romero's neighborhood and

11 drove a 1996 Chevrolet Impala with silver rims. (ECF No. 1 ¶¶ 11–12, Apr. 9, 2018.)

12 Significantly, this information provided by the informant was corroborated by the DEA team's

13 own investigating agents on October 25, 2017. (ECF No. 1 ¶¶ 13–17, Apr. 9, 2018.) Second, the

14 DEA team actually observed this Impala and its driver engage in activity consistent with narcotics

15 distribution on October 25, 2017 (ECF No. 1 ¶¶ 16–17, 19–21, Apr. 9, 2018), whereas the

16 probable cause in *Garcia-Lopez*, 2015 WL 2152766, at *1–3, was predicated almost entirely on

17 recorded phone conversations overheard by investigating agents. The DEA team in this case saw

18 the Impala operating as a tool of narcotics distribution, as opposed to merely inferring — as the

19 agents in *Garcia-Lopez*, 2015 WL 2152766, at *3, did on the basis of recorded phone

20 conversations — that they "would find evidence of a crime by tracking [the target] car." Third,

21 the investigating team in the instant case uncovered telephonic evidence that, when viewed

22 through the prism of Agent Anderson's extensive law enforcement experience, suggested that the

23 owner of the phone in question was engaging in illegal narcotics distribution. (ECF No. 1 ¶¶ 25–

24 26, Apr. 9, 2018.)

25     None of the above evidence relies in any way on the identity of the Impala's driver who

26 was subsequently photographed, and mistakenly identified as Anthony Blanks, by law

27 enforcement agents on October 25, 2017. (ECF No. 1 ¶¶ 23–24, Apr. 9, 2018.) The driver of the

28 Impala could have been identified as anybody or as nobody on that day, and probable cause to

affix a GPS tracking device to the Impala would still have existed. This is because the evidence

of the Impala being used to traffic illegal narcotics that was unrelated to Blanks's identity

nonetheless constituted a "substantial basis" to conclude that probable cause existed. *Krupa*, 658

F.3d at 1177 (quoting *Jones*, 362 U.S. at 271). Accordingly, since the Court finds that the

original November 27, 2017 warrant to install a GPS tracking device on the Impala was supported

by probable cause, Defendants' argument that all subsequent evidence collected in this

investigation is the inadmissible fruit of that November 27, 2017 poisonous tree (ECF No. 36 at

9; ECF No. 39 at 5) must fail.

*iii.*      *Probable Cause to Arrest Padilla*

Defendants argue only briefly that there was no probable cause to arrest Padilla when the

investigative team encountered him upon execution of their search warrants on April 10, 2018.

(*See* ECF No. 36 at 3 ("Despite the agent's positive identification of Anthony Blanks while

driving the Impala and during alleged drug transactions with Romero, agents arrested Salvador

Padilla.").)

This is likely because the same probable cause that existed to search the Impala's driver's

residence on April 10, 2018, also sufficed to arrest the Impala's driver when law enforcement

officers encountered him in his residence on that date and recognized him as the person they had

been surveilling for months. *See Giordenello v. United States*, 357 U.S. 480, 485–86 (1958)

(noting that the Fourth Amendment's probable cause standard "of course applies to arrest as well

as search warrants"); (ECF No. 43 at 2 (stating that agents realized upon execution of the search

warrants that the individual they had been surveilling was Padilla, not Blanks); ECF No. 36 at 3

("Subsequent to Mr. Padilla's arrest, the agent altered the affidavit by replacing Blanks [sic] name

with Padilla's."); ECF No. 1 ¶ 93, Apr. 10, 2018 ("Investigators took PADILLA into custody

based on probable cause that he had committed various offenses of the federal criminal code, as

set forth below.")). There was substantial evidence known to agents at the moment they came

upon the Impala's driver on April 10, 2018 that this individual — whatever his name — had

committed narcotics offenses, including his telephonic and in-person interactions with Romero

before and following the controlled drug purchase on October 25, 2017 (ECF No. 1 ¶¶ 13–26,

33

Apr. 9, 2018); his counter-surveillance driving maneuvers on that date (ECF No. 1 ¶¶ 17, 20, Apr. 9, 2018); his telephonic and in-person interactions with Romero before and following the controlled drug purchase on December 4, 2017 (ECF No. 1 ¶¶ 32–42, 44–48, Apr. 9, 2018); his interactions with a surveilling DEA agent prior to the first controlled drug purchase on February 13, 2018 (ECF No. 1 ¶¶ 49–53, Apr. 9, 2018); his telephonic and in-person interactions with Romero and Mendez prior to the second controlled drug purchase on February 13, 2018 (ECF No. 1 ¶¶ 53–62, Apr. 9, 2018); and his attempts to conceal the Impala and to photograph surveilling DEA agents on March 6, 2018 (ECF No. 1 ¶¶ 68–71, Apr. 9, 2018). This is more than sufficient to supply probable cause to arrest Padilla on April 10, 2018 because, "under the totality of the[se] circumstances, a prudent officer would have believed that there was a fair probability that [Padilla] committed a crime." *Collins*, 427 F.3d at 691.

Agent Anderson's affidavit states that after they encountered the Impala's driver inside 5120 25th Street on April 10, 2018, agents developed further evidence pointing to Padilla being the true identity of the Impala's driver who had committed the various acts they observed over the preceding months. (*See* ECF No. 1 ¶ 94.) This additional evidence adduced on April 10, 2018, however, is irrelevant to the Court's finding that Agent Anderson's April 9 affidavit established probable cause to arrest Padilla when he was recognized as the Impala's driver once contacted by law enforcement inside 5120 25th Street on April 10, 2018.

## IV.   CONCLUSION

Defendants' motions, to the extent they request a *Franks* hearing (ECF No. 36; ECF No. 39), are DENIED because Defendants fail to meet their burden to show that the misidentification of Padilla as Blanks was anything more than a negligent mistake.

Defendants' motions are also DENIED, to the extent they seek the suppression of evidence gathered as a result of agents' reliance on search warrants supported by Agent Anderson's probable cause affidavits, because those affidavits still established probable cause even when stripped of all references to Anthony Blanks.

///

///

1        IT IS SO ORDERED.

2  Dated: May 21, 2019

Troy L. Nunley
United States District Judge